# UNITED STATES

v.

**Terry S. FITTEN, 276–66–5673 Mess Management Specialist Third Class (E–4), U.S. Navy.**

**NMCM 92 0815.**

U.S. Navy–Marine Corps
Court of Military Review.

Sentence Adjudged 5 Feb. 1992.

Decided 26 Oct. 1993.

---

LT James A. Douglas, JAGC, USNR, Appellate Defense Counsel.

· LT J.M. Kegelmeyer, JAGC, USNR, Appellate Government Counsel.

Before LARSON, C.J., and WELCH and MOLLISON, JJ.

WELCH, Senior Judge:

The appellant, in his first assignment of error, challenges the propriety of using evidence obtained by his forced catheterization at U.S. Naval Hospital, San Diego.[1] The urine extracted from the appellant provided evidence of his use of cocaine and marijuana.[2]

---

[1] I. THE MILITARY JUDGE ERRED IN DENYING THE DEFENSE MOTION TO SUPPRESS EVIDENCE DERIVED FROM THE FORCED CATHETERIZATION OF APPELLANT IN THAT THE PROCEDURE, UNNECESSARY AND UNREASONABLY INTRUSIVE, VIOLATED DUE PROCESS. (FOOTNOTE OMITTED.)

II. THE COURT–MARTIAL HAD NO JURISDICTION BECAUSE THE MILITARY JUDGE'S LACK OF A FIXED TERM OF OFFICE LEFT THE MILITARY JUDGE INSUFFICIENTLY INDEPENDENT TO SATISFY THE FIFTH AMENDMENT'S DUE PROCESS CLAUSE. (CITATION OMITTED.) BECAUSE THE ERROR IS JURISDICTIONAL AND THE RECORD CONTAINS NO EVIDENCE OF A KNOWING WAIVER OF APPELLANT'S RIGHT TO AN INDE-PENDENT MILITARY JUDGE, THE ISSUE IS NOT WAIVED EVEN THOUGH IT WAS NOT RAISED AT TRIAL.

III. THE COURT–MARTIAL LACKED JURISDICTION BECAUSE APPELLANT'S MILITARY JUDGE WAS DESIGNATED IN VIOLATION OF THE APPOINTMENTS CLAUSE OF THE CONSTITUTION. (CITATIONS AND FOOTNOTE OMITTED.) BECAUSE THIS ERROR IS JURISDICTIONAL, THE ISSUE IS NOT WAIVED EVEN THOUGH IT WAS NOT RAISED AT TRIAL.

[2] Appellant was convicted by special court-martial of violating Articles 86 and 112a, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 886 and 912a, respectively, by unauthorized

Appellant's conviction was based on his plea of guilty to unauthorized absence and his conditional plea of guilty to the wrongful use of cocaine and marijuana. His conditional plea was entered after the judge denied his motion to suppress the results of tests performed on the urine obtained by catheterization. We hold that the judge properly denied the motion to suppress evidence. Our reasoning follows.

## I. *The Factual Setting*

At approximately 1000, 16 December 1991, the appellant turned himself in at the Chaplain's Office at Naval Station, San Diego. He appeared to be under the influence of an unknown substance.

At approximately 1030, he was taken to the Branch Medical Clinic at Naval Training Center, San Diego, and given a competence for duty examination. He was found unfit for duty due to the use of drugs or alcohol.

At approximately 1300, he was transported to U.S. Naval Hospital, San Diego. Dr. W, a medical officer, saw appellant upon arrival. He observed that appellant was intermittently obtunded (not acting normally; in an altered mental status—"like . . . psychiatrically ill, intoxicated, what ever") and combative (striking out, moving about, and talking in a very loud tone or yelling). Because such action might be caused by anything from metabolic deficiencies to head injuries to drug intoxication, Dr. W's initial treatment included (a) a metabolic screen to test for different chemicals in the blood, (b) a C-spine precaution (placing appellant in a rigid brace—a "Philadelphia collar"—that prevents movement of the neck, and strapping the appellant to a spine board), (c) ordering a CAT scan of the appellant's brain, and (d) ordering a dangerous drug screen. Record at 10–13.

At U.S. Naval Hospital, San Diego, dangerous drug screening tests are done using urine specimens because blood testing is not readily available. If a patient-service member is either unwilling or unable to provide a urine specimen, and the patient's condition is

potentially life threatening, the practice generally followed at the hospital is to obtain a urine specimen by catheterization. Record at 13. Dr. W ordered such testing of the appellant because the appellant's behavior was potentially drug related and symptomatic of a life threatening situation. Record at 14. In response to questions by the trial judge, Dr. W explained the dichotomy that exists when a patient does not consent to providing a urine specimen and the physician concludes that obtaining a specimen is necessary. If the patient is a civilian, the civilian can say "No. I don't want you to do it." and sign out against medical advice. Not so with an active duty military patient:

> [W]e are required by our military law to perform what we think is in their best interest medically. There are some gray lines on it—in that area, but in a case like this, it's pretty clear-cut that they don't have a right to sign out against medical advice and they need to have that test done.

Record at 21.

The order to catheterize appellant was given within the first hour after his arrival in the emergency room. According to Dr. W, it is important to have catheterization done quickly in situations like the appellant's in case there is a toxin in the patient's body. Additionally, in his opinion, the "standard of care" requires that information from a dangerous drug screen be obtained within the first couple hours of the patient's stay in the emergency room. Tests results of urine obtained by catheterization are normally known within 15 to 30 minutes after the specimen is obtained from the patient. Record at 18–19.

Mrs. B, a licensed civilian nurse, who started caring for the appellant when he arrived in the emergency room, performed the catheterization. She had performed literally hundreds of catheterizations, a procedure done daily in the emergency room. On any given day, she might do 10 or more. Nurse B's description of the appellant's actions in the emergency room includes the following:

absence, and illegally using marijuana and cocaine. The judge sentenced him to 45 days confinement, reduction to pay grade E–1, and a bad-

conduct discharge, which was approved by the convening authority.

Mr. Fitten was disoriented ... very abusive both verbally and physically, combative, striking out, at one point, catching me, slapping me with the backhand across my face, hitting my jaw ... [W]e had extreme difficulty trying to get the IV lines in. We were uncertain of what was wrong with Mr. Fitten at this point. We weren't sure if it was alcohol or drugs or closed head injury, anything at this point.

Record at 24. When appellant continued his combative conduct, Nurse B ordered that soft restraints be applied by corpsmen to keep the appellant from pulling IV lines out. Appellant attempted to pull the IV lines out and ripped off the soft restraints. When Nurse B's next efforts to calm the appellant failed, she ordered the corpsmen to apply "four point" leather restraints for the appellant's safety and the safety of hospital personnel; such restraints are frequently used in emergency rooms to control abusive patients. At the time, Nurse B was assisted by three corpsmen; several security personnel were also present.

After the appellant arrived at the emergency room, Nurse B asked him several times if he would provide a urine specimen. The appellant was either unable or unwilling to provide the requested specimen. Thus, after about an hour and one half of attempting to obtain a voluntarily provided specimen from the appellant, Nurse B catheterized the appellant based on a doctor's order. Record at 25. She began the process by swabbing the appellant's penis three times with betadine, an antiseptic, and explaining the process to the appellant. At that time, appellant had calmed down somewhat; he was talking to Nurse B; he was relaxed a bit. Nurse B testified that the appellant never made any verbal protest to her concerning the procedure and that he was cooperative. Record at 25–28. Parenthetically, we add (a) that Nurse B candidly testified that "when you have somebody's penis in your hand, they're not going to fight a whole bunch," and (b) that the appellant later testified that he had tears in his eyes during the process.

Nurse B inserted the appropriate tubing into appellant's penis and withdrew urine from his bladder. The process took "just a couple of minutes." Record at 32. Nurse B collected two containers of urine while the tubing remained inserted. There was "no time difference between" the collection of the "bottle A" specimen and the "bottle B" specimen because there was a continual drip of urine coming out of the tubing. Record at 27.

While Nurse B was conducting the catheterization, Senior Chief C was nearby. He was the appellant's command's chief investigator, as well as the urinalysis coordinator. He had been sent to the hospital at about 1300 to attempt to obtain, with the appellant's consent, a specimen of the appellant's urine. The appellant had refused to voluntarily contribute a specimen. After the appellant refused to voluntarily comply with Senior Chief C's request, Senior Chief C was advised by Nurse B that the appellant had mentioned to her that he had a "drug weekend." Record at 38. Senior Chief C conveyed this information to the appellant's command's staff judge advocate by telephone. Soon thereafter, the staff judge advocate called back to Senior Chief C and told him that appellant's commanding officer had authorized a probable cause search of the appellant's urine. Record at 38–39. *See also* App. Ex. I and II.

The commanding officer's authorization to search based upon probable cause was conveyed to Senior Chief C moments before the catheterization was started. Nothing in the record indicates the authorization directed a catheterization, leaving open the inference that the commanding officer's intent could have been that the appellant be ordered to produce a specimen and that the Senior Chief standby with bottle in hand. Nevertheless, Senior Chief C told Nurse B that he had permission to get a sample of the appellant's urine. Record at 40. While Senior Chief C was talking to the staff judge advocate, Nurse B continued the process of catheterization because, in her words, "[i]t was important that we find out what was wrong with Mr. Fitten so I continued." Record at 27. *The order from appellant's command "played no role" in Nurse B's decision to catheterize him—she was going to do it with*

or without approval of the appellant's command. Record at 34.

After obtaining urine for the dangerous drug screening test in "bottle A", Nurse B asked Senior Chief C for his bottle, "bottle B." She then let some of appellant's urine drip from the tubing into bottle B. Thereafter, Nurse B looked at bottle B and said "I'm not sure if this is enough," and poured some of the urine from bottle A into bottle B while commenting "[t]his is more than enough for us and this should be enough for your sample." Record at 38. Urinalysis testing of the content of bottle B later produced the evidence that led to the preferral of charges against the appellant.

## II. Prosecution Based on Evidence Obtained From Forced Catheterization

The appellant contends that the trial judge erred when he denied his motion to suppress evidence derived from appellant's forced catheterization. According to the appellant, obtaining evidence in this manner was unnecessary and unreasonably intrusive, and in violation of due process of law. He cites as dispositive Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), discussed below, and Mil.R.Evid. 312(d), which states in part that "[i]nvoluntary extraction of body fluids under this rule must be done in a reasonable fashion by a person with appropriate medical qualifications."[3]

The Government responds that the appellant's urine was properly obtained for a valid medical purpose, as authorized by Mil. R.Evid. 312(f), which states:

**Intrusions for valid medical purposes.** Nothing in this rule shall be deemed to interfere with the lawful authority of the armed forces to take whatever action may be necessary to preserve the health of a servicemember. Evidence or contraband obtained from an examination or intrusion conducted for a valid medical purpose may be seized and is not evidence obtained from an unlawful search or seizure within the meaning of Mil.R.Evid. 311.

3. At trial, the defense counsel advised the judge that the issue presented was "very narrow.

On 21 May 1954, a divided United States Court of Military Appeals discussed at length the use of evidence obtained as a result of catheterization of a service member. See United States v. Williamson, 4 U.S.C.M.A. 320, 15 C.M.R. 320 (1954); United States v. Booker, 4 U.S.C.M.A. 335, 15 C.M.R. 335 (1954). In Williamson, the Court held that the results of urinalysis of a specimen obtained from an unconscious service member could be used in evidence against him without violating his right against self-incrimination. In Booker, the Court held that the results of catheterization of a service member with his consent could be used in evidence against him. Obviously, neither case is on "all fours" with appellant's case. However, in Williamson each judge discussed Rochin (holding that use of evidence obtained by pumping the accused's stomach was a violation of due process of law because it "shocks the conscience"), with Judge Brosman stating:

If the case before us involved real evidence obtained from an accused person by use of a catheter and over his protest, I should similarly conclude that fundamental standards of decency in law enforcement has been infringed, and that a conviction predicated in any part on such evidence violated the concept of "military due process."

Williamson 4 U.S.C.M.A. at 329, 15 C.M.R. 320.

If the appellant had presented us with a pure case of a commanding officer directing a probable cause search by catheterization of an obviously healthy service member, we would probably quote the words of Judge Brosman and rule in appellant's favor. But that is not the case before us. The testimony of Dr. W and Nurse B convinces us that appellant was subjected to involuntary catheterization solely on the basis of medical necessity (the appellant displayed signs indicative of drug use and the emergency room physician needed to determine the nature of the substance in the appellant's body to assure that appellant did not die).

We're not arguing that there was not a proper search authorization." Record at 7.

■ We fine-tune the issue raised by the appellant by noting that urine from appellant's bladder eventually went in two directions: "bottle A" to the hospital technicians and "bottle B" to the drug screening laboratory to build a case against the appellant. When faced with a similar situation, albeit not involving catheterization, the U.S. Air Force Court of Military Review held "that once the government lawfully possesses a urine sample it may conduct any laboratory test for drugs it wishes on the specimen." *United States v. Jenkins,* 24 M.J. 846, 848 (A.F.C.M.R.1987), citing *United States v. Nand,* 17 M.J. 936, 937 (A.F.C.M.R.1984), which states "[t]he fact that a portion of the urine sample was used for another purpose is irrelevant since the sample was validly taken." *See also United States v. Cannon,* 29 M.J. 549, 554 (A.F.C.M.R.1989).

■ Although we agree with the principles stated in the above cited cases, none of them squarely address questions raised by the logical observation that catheterization may be prolonged for some brief period of time if a "bottle B" is partially filled for forensic testing. Frankly, our conscience is not "shocked" by such conduct. We believe that concerns expressed in *Rochin* and *Williamson* are allayed when forced catheterization is initiated by appropriately qualified service medical personnel acting to save the life of a service member. Under these circumstances, we find no support in law or reason for a *per se* rule excluding evidence captured in a "bottle B," either from the direct flow from the end of the tubing used or from decantation. Rather, in such cases, we will examine all the circumstances to determine the reasonableness of the action taken and the legal basis for admission of evidence of urinalysis testing.

■ In this case—reminiscent of a proverbial law school examination question, based in part on Nurse B's pouring of urine from "bottle A" to "bottle B"—we find two alternative grounds for upholding the judge's ruling. First, we find that the urine in "bottle B" contained an undetermined, but significant, amount of appellant's urine that had been properly captured for a valid medical reason in "bottle A." Thus, we conclude that the urine obtained was in essence all one sample extracted during an intrusion conducted for a valid medical purpose; *ergo,* the evidence was admissible under Mil.R.Evid. 312(f) and the principles in *Jenkins, Nand,* and *Cannon.* Alternatively, we find that the appellant's urine was obtained in a reasonable fashion—reasonable because catheterization was required as part of an effort to preserve his life—by a person with appropriate medical qualification, and pursuant to a proper command authorized probable cause search per Mil.R.Evid. 315; *ergo,* the evidence was admissible under Mil.R.Evid. 312(d) and need not have been excluded under the principles of *Rochin.* Thus, we conclude that the first assignment of error is without merit.

### III. *Other Assignments of Error*

The remaining assignments of error also lack merit. *United States v. Weiss,* 36 M.J. 224 (C.M.A.1992), *cert. granted,* —— U.S. ——, 113 S.Ct. 2412, 124 L.Ed.2d 635 (1993); *United States v. Graf,* 35 M.J. 450 (C.M.A. 1992).

The findings and sentence, as approved on review below, are affirmed.

LARSON, Chief Judge (concurring):

I concur that the results of the urinalysis conducted in this case were admissible under Mil.R.Evid. 312(f). I write separately only to address the principal argument advanced by Senior Judge Mollison in dissent. His position draws a bright line between urine drawn for medical purposes and that drawn for purposes of prosecution. He finds that this latter urine is not covered by Mil.R.Evid. 312(f) and that there is no other basis for admissibility adequately developed on the record.

I do agree that a line can be drawn to separate those bodily fluid extractions which violate the Fourth Amendment and those that do not. However, the distinction should be between an *intrusion* into the body for medical purposes and one for purposes of prosecution, not between the uses of the urine obtained as the result of a lawful intrusion. Once the intrusion is made for a valid

medical purpose, I read Mil.R.Evid. 312(f) to permit any use to be made of the evidence (i.e., urine) obtained thereby. In this case, the intrusion was made and urine was extracted for a valid medical purpose. The brief collection of an additional amount of urine immediately following the medical collection did not, to any appreciable degree, constitute a separate search or seizure for Fourth Amendment purposes.[1]

Furthermore, even if the extraction of additional urine could be considered a separate "seizure" under the Fourth Amendment, in view of the facts that it required no further intrusion into the body of the appellant and that the catheter remained inserted only for a very brief additional period of time, I find the additional invasion of the appellant's privacy interests to be minimal and the seizure to be reasonable and therefore, not in violation of the appellant's rights under the Fourth Amendment. In fact, I see little difference between this situation and one where urine extracted for medical testing is thereafter turned over to law enforcement officials as criminal evidence. *United States v. Miller*, 15 U.S.C.M.A. 320, 35 C.M.R. 292, 1965 WL 4666 (1965).

Drawing a distinction in terms of the purpose of the intrusion rather than the purpose of the extracted urine would also be consistent with the case law cited in the dissent. In every case cited by Senior Judge Mollison in support of his position, the original intrusion was made expressly for law enforcement purposes. *See, e.g., United States v. Jones,* 5 U.S.C.M.A. 537, 18 C.M.R. 161, 1955 WL 3301 (1955). Only in that situation is it necessary, for legal analysis purposes, to determine another basis for admission (e.g., command authorization based on probable cause) and to consider the "shock the conscience" circumstances typified in *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). We do not have that situation here.

MOLLISON, Senior Judge (dissenting):

The principal issue in this appeal from a special court-martial conviction for wrongful use of controlled substances is whether the military judge erred in denying the appellant's motion to suppress the results of a urinalysis of a specimen extracted from the appellant by means of involuntary catheterization. I am of the opinion the military judge erred. I would set aside the findings of guilty and sentence and authorize a rehearing.

## I.

Consistent with his pleas of guilty, the appellant was found guilty of one specification alleging a 2½-hour unauthorized absence and two specifications alleging wrongful use of controlled substances, in violation of Articles 86 and 112a, respectively, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 886, 912a. The pleas of guilty to the drug offenses were entered conditionally after the appellant unsuccessfully moved to suppress the results of a urinalysis upon which those specifications were apparently based. Rule for Courts–Martial (R.C.M.) 910(a)(2), Manual for Courts–Martial, United States, 1984. A military judge sitting alone sentenced the appellant to confinement for 45 days, reduction to pay grade E–1, and a bad-conduct discharge. The convening authority approved the sentence without modification. UCMJ art. 60, 10 U.S.C. § 860. The appellant's case is now before this Court for review in accordance with Article 66, UCMJ, 10 U.S.C. § 866.

This Court may only affirm such findings of guilty and the sentence or such part or amount of the sentence as it finds correct in law and fact and determines, on the basis of the entire record, should be approved. UCMJ art. 66(c), 10 U.S.C. § 866(c). This Court may not set aside a finding of guilty or the sentence on the basis of an error of law unless the error is materially prejudicial to

---

**1.** A different result may be obtained if the catheter were left inserted for a significant period of time as, for example, where medical personnel have finished their seizure but agree to wait for guidance from law enforcement officials. At some point in time, the medical purpose for the intrusion would lapse and the seizure of addi-

tional urine as criminal evidence would no longer be covered by Mil.R.Evid. 312(f). In this case, we need not determine where that point in time is because the additional extraction of the appellant's urine was apparently accomplished immediately with no interruption in the flow through the catheter.

the substantial rights of the appellant. UCMJ art. 59(a), 10 U.S.C. § 859(a).

The appellant assigned the following error in the conduct of his court-martial:

THE MILITARY JUDGE ERRED IN DENYING THE DEFENSE MOTION TO SUPPRESS EVIDENCE FROM THE FORCED CATHETERIZATION OF APPELLANT IN THAT THE PRO-CEDURE, UNNECESSARY AND UN-REASONABLY INTRUSIVE, VIOLAT-ED DUE PROCESS [citing *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952); Mil.R.Evid. 312(d) ].

## II.

Prior to entry of pleas, the appellant moved to suppress a urinalysis on a specimen extracted by catheterization from him at the Balboa Naval Hospital in San Diego. R.C.M. 905(a)(3); Mil.R.Evid. 311(d). At a pre-trial session, conducted pursuant to Article 39(a), UCMJ, 10 U.S.C. § 839(a), the parties called four witnesses and entered into a stipulation of fact. In sum, the evidence shows that urine was extracted from the appellant over his objection by means of a catheter inserted in his penis by a hospital nurse. Two specimens were drawn. One was retained by the hospital for testing, while a second specimen was immediately surrendered to a command investigator who was present during the catheterization. The specimen provided to the base investigator was eventually trans-ported to a Navy drug laboratory for testing. Although the record is not entirely clear on this point, it appears that this second speci-men tested positive for the presence of the metabolites of cocaine and marijuana, and it is on the basis of this test that the appellant was prosecuted. A more detailed statement of the evidence follows.

On Monday morning, 16 December 1991, the appellant turned himself in to the Chap-lain's Office at Naval Station, San Diego. The appellant appeared to be under the influ-ence of an unknown substance. Shortly thereafter, he was transported to the Branch Medical Clinic at Naval Training Center, San Diego where he was administered a compe-tency for duty examination and was found unfit for duty due to the use of drugs or alcohol.[1] At 1300 the same day, the appel-lant was transported to the Balboa Naval Hospital for further evaluation and treat-ment. Stipulation of Fact, Appellate Exhibit III.

Lieutenant Woods, a medical officer on duty in the emergency room for a portion of the time the appellant was present there, testified that the appellant was noted upon presentation to be intermittently obtunded (not responsive to questioning or gentle sti-muli)[2] and combative. The initial impression of the staff was that the appellant had an "altered mental status." A protocol is fol-lowed when a patient presents this status. Several causes for it must be considered, i.e., metabolic deficiencies, head injuries, drug in-toxication. A work-up is embarked upon to ensure the causes are not life- or limb-threat-ening. Record at 12. Blood tests, a CAT-scan, immobilization, and a "dangerous drug screen" are parts of this protocol. According to Dr. Woods, all of these measures were ordered in the appellant's case by him. Rec-ord at 12–13.

Dr. Woods further explained that the "dan-gerous drug screen" is accomplished by uri-nalysis at this naval hospital. Blood testing is not available there. If the patient is un-willing to provide a urine specimen, if the patient is a military member, and if the patient's behavior is potentially life-threaten-ing, a "catheterized urine specimen" is gener-ally obtained. Record at 13, 21. A patient who is intermittently obtunded and combat-ive is considered to be in a life-threatening condition. Record at 14.

The "catheterized urine specimen" is de-scribed by Dr. Woods as one that:

---

1. The evidence derived from a mandatory urinal-ysis as a result of a competency for duty determi-nation is admissible only for the purposes of impeachment and rebuttal. *United States v. Das-kam*, 31 M.J. 77 (C.M.A.1990). *See also United States v. Ouellette*, 16 M.J. 911 (N.M.C.M.R. 1983).

2. Obtund: To dull or blunt, especially sensation or pain. Webster's New World Stedman's Con-cise Medical Dictionary 519 (1987).

basically entails a corpsman, nurse or doctor, someone who is trained, will, you know, in a male, clean the tip of the penis off with a sterile solution called betadine and holding the penis with one hand will insert a tube that is slightly, maybe half the size of my little finger through the penis into the bladder. Urine returns at that point. As soon as the urine sample is obtained in a case like this, the catheter is generally withdrawn. It can also be inserted—a balloon inflated. It can be left in other cases.

Record at 14. Catheterization is performed three to 12 times a day in the hospital. *Id.*

Dr. Woods also described the pain and risks associated with this procedure:

I think most people that are not obtunded would describe it as uncomfortable. We do many things that are much more uncomfortable. I think there is a great deal of psychological overlay in a case like this with catheterization where people don't generally like having things stuck in their penis and the little bit of discomfort, I think, probably is magnified by many people with psychological overlay.

\* \* \*

Somebody who's truly obtunded and not playing at being obtunded, which sometimes we have difficulty assessing, then they wouldn't feel anything. If they were truly obtunded, part of the definition is that they don't respond to physical stimuli. Okay. If it's somebody who's just being difficult then they might—then they would perhaps feel it the same amount that that other people would and they would describe it as uncomfortable.

\* \* \*

The studies indicate that if you leave [the catheter] in for any length of time that the risk of infection is somewhere around one percent. The risk of doing what we call a quick catheter, or an in-and-out catheterization is somewhere below that, but I can't give you an exact amount.

Record at 15.

The catheterization of the appellant was ordered some time within the first hour of his stay at the hospital, however, Dr. Woods was not present when the catheterization was accomplished. Record at 16, 18–19. The record is not clear as to whether Dr. Woods personally ordered the catheterization. Record at 19. Dr. Woods also testified that he was not made aware that the appellant did not want to be catheterized, however, it would have made no difference and the hospital staff would have proceeded inasmuch as they still needed the information and the appellant "did not have the right to sign out against medical advice." Record at 21.

The attending nurse, Ms. Margaret Broadwell, also testified. She stated the appellant was disoriented as to time and place. He was "very abusive both verbally and physically, combative, striking out." Record at 24. At one point he backhanded her across the face and hit her jaw. *Id.* She explained the staff was not sure whether the appellant was on alcohol or drugs or suffered from a closed head injury. A corpsman tried to start an "IV", but had extreme difficulty getting the lines in. The nurse talked to the appellant and he calmed down sufficiently for the insertion of the IV. The nurse returned later and again found the appellant "getting very, very combative." When the appellant attempted to pull out the IV lines, he was placed in soft restraints. When he ripped off the soft restraints and again started swinging and throwing his arms about trying to get off of the gurney, four-point leather restraints were applied. The appellant was also restrained by three corpsman and base security personnel. Record at 24–25.

The nurse testified that she had been instructed to obtain urine from the appellant from the time that he arrived. The nurse asked him several times whether he would provide a specimen, however, he "was either unable or wouldn't" provide a specimen. Record at 25. Between an hour and an hour and one-half after the appellant had been there, either the medical officer or an attending intern (the nurse cannot recall which) ordered a catheterized urine sample for a dangerous drug screen. Record at 25, 29. Though she customarily had a male corpsman perform the catheterization on male patients, the nurse elected to perform this catheterization on the appellant, herself, explain-

ing the corpsmen were "shook up over the ordeal" and the appellant seemed to respond to her voice better than he did to the corpsmen. Record at 30–31, 33. The nurse further testified that the appellant had calmed down considerably prior to the time the catheterization was performed. He "wasn't swearing quite as much," and he was a little more oriented. Record at 26. When the actual catheterization was performed, the appellant was "very, very calm," and, as the nurse explains, "[W]hen you have somebody's penis in your hand, they're not going to fight you a whole bunch...." Record at 28.

Prior to the catheterization of the appellant by the nurse, the nurse informed one of the chief petty officers accompanying the appellant that she was going to obtain a urine specimen "for my dangerous drug screen for medical purposes." Record at 27. The chief petty officer called someone and then informed her that he had authorization and asked her for a specimen. Record at 27, 30. The nurse then catheterized the appellant. She got a return, but the appellant's bladder was very dry. Nonetheless, the nurse collected two containers out of the same catheterization while the tube remained in the appellant's penis. The nurse sent one specimen to the hospital "stat lab" where a drug screen was performed. Record at 27. (The results of this urinalysis are not in the record.) According to the nurse, she then handed a specimen from the same catheter to the chief that was witnessing the catheterization. Record at 27. The nurse "only had a small enough sample to barely get enough for [the hospital] and the investigator." Record at 28. The nurse further testified that although she was informed the chief had some type of authorization, that fact played no role in her decision to catheterize the appellant. She was catheterizing the appellant pursuant to doctor's orders and would have done so with or without the chief's getting a specimen. Record at 31, 34. According to the nurse, "it took just a matter of minutes" to acquire the urine specimens through the catheter. Record at 32. Finally, the nurse testified that the appellant was not sedated or administered any "pain killers." Therefore, she surmises that he would have felt the "limited pain involved with the catheterization." Record at 23–33.

Next Boatswain's Mate Senior Chief Burton testified. He was the Naval Training Command's chief investigator and urinalysis coordinator. He had been informed by a legalman that the legal officer, Lieutenant Commander Clopton, wanted the senior chief to try to get a specimen from the appellant. Senior Chief Burton went to the hospital for this purpose. He found the appellant in a bed nodding in and out of sleep. The appellant responded to the senior chief's request for a urine specimen by saying that he wanted to leave the hospital and by pulling on his IV. Record at 36. Once restrained, the appellant responded in the negative to a second request for a urine specimen. Record at 37. As the senior chief was walking out of the area to telephone the legal officer, the nurse informed him that the appellant had mentioned he had had a drug weekend. Record at 37. The senior chief telephoned the legal officer and related this information to him and asked whether that was probable cause to get a urine specimen. Record at 38. The legal officer informed the chief that he would have to check with "the boss" and would call him back. Five minutes later, the legal officer called the senior chief back and "said that they felt they had probable cause to go ahead and get a sample." Record at 38. The record does not state who "the boss" was, whether anyone in authority authorized the taking of a specimen, or whether that person authorized an extraction of body fluids by catheterization. In any case, the senior chief hung up the telephone and returned to the space where the medical staff was preparing a catheter. Senior Chief Burton then testified:

I told them I had permission to get a sample and if it was possible to get enough of a sample that I would like to get one. They used the catheter to get their's out and when she was done, she asked me for my bottle and what was left I got. And then she took a look at the amount that was in the bottle, and she said, "I'm not sure if this is enough," and she poured a little bit into the bottle. She said, "This is more than enough for us and this should be enough for your sample," and I took the

sample from the nurse, put the lid on it, put the label on and put the seal on it, placed it in the box with the tape around the box and hand carried it over to the lab after I finished the paperwork.

Record at 38. As to whether the appellant verbally objected to the catheterization, the senior chief thought the appellant said, "I don't want that. I'm not having it." Record at 42.

Finally, the appellant took the stand and testified for the limited purpose of the motion to suppress. In substance, he testified that he refused the senior chief's request for a urine specimen because he figured the senior chief could get it from the hospital when they got theirs. Record at 46. He also testified that he told the nurse he did not want her to catheterize him because he felt he could drink something and urinate. Record at 47. Further the appellant testified the procedure was very painful because it lasted so long. More specifically, he testified:

> She couldn't get no—no urine. I was dehydrated and she had to—I remember she said, "We're going to have to tickle it," or something, and she went all the way down and came back up and did it again like sort of to, you know, make it—.

> \* \* \*

> Once the tickling sensation part didn't work, she had to go all the way and then she pumped some apparatus to open up my bladder or something and I'm watching all of this in pain and they could see the tears in my eyes. I was crying.

> \* \* \*

> [The whole procedure was] degrading. I think that was so vile, you know. I couldn't understand what was—mean enough on me (sic). I was there. I was there almost two hours and all of a sudden I'm being put under this cruelty, you know, just to give a sample all of a sudden. It was all of a sudden because Senior Chief showed up and there was a rush. I couldn't understand. I heard—I heard it. And during the procedure there was talk—talk going on of how, you should have, you know, did this, you should have—and security guards in there, they're talking and

> when finally got something it was like applaud, you know, because they was trying so long and when she sticked it up in my bladder and came out with something, it was—

Record at 46–48. Finally, the appellant testified that there were 10 people present during the whole process. Record at 48.

The Government argued at trial that the motion to suppress should be denied because the extraction of urine from the appellant did not violate the appellant's due process rights under the Fourteenth Amendment [sic]. He also argued that the extraction was admissible under Military Rule of Evidence (Mil. R.Evid.) 312(d), which authorizes involuntary extractions of body fluids upon probable cause, and further that the sample was admissible under Mil.R.Evid. 312(f), which permits the admission of evidence obtained from a body intrusion for a valid medical purpose. The appellant contended that the search of the appellant's urine violated his due process rights under the Fourteenth Amendment [sic], citing *Rochin* and *United States v. Williamson*, 4 U.S.C.M.A. 320, 15 C.M.R. 320, 1954 WL 2295 (1954), and that the admission could not be justified on the basis of the "valid medical purpose" rule, Mil.R.Evid. 312(f). The military judge entered the following essential findings:

> Let me say preliminarily that if the sole purpose of catheterization in this case had been to obtain evidence for prosecution, I would not hesitate to find that the forcible catheterization of a conscious protesting suspect would be an unreasonable search and seizure, notwithstanding the provisions of MRE 312(d), for the reasons set forth in *Williamson* and *Rochin v. California*. In his concurring opinion in *Williamson*, Judge Brosman ably argues the reasons why such procedure would in the words of *Rochin v. California*, shock the conscience, the physical discomfort, the risk of infection and what Judge Brosman referred to as the psychological impact and what our Dr. Woods here today referred to as "psychological overlay," all argue against this as an approved method of evidence collection.

Besides, if evidence had been the sole object of this exercise, the command would have had the reasonable alternatives of waiting until Petty Officer Fitten could provide a sample naturally, under apprehension, if necessary, or prosecuting him for failure to obey a lawful order to provide a sample.

It is worthwhile to note here that there was no evidence that Petty Officer Fitten's Commanding Officer ever ordered him to be catheterized.

BMCS Burton was directed to try to obtain a sample of Petty Officer Fitten's urine by consent, if possible, or by execution of a search authorization if necessary, but only with the tacit understanding that Petty Officer Fitten was being catheterized for diagnostic purposes anyway.

I find that Dr. Woods ordered, and Nurse Broadwell performed, a catheterization of Petty Officer Fitten solely for authorized medical purposes. The fact that a portion of the urine thus extracted from Petty Officer Fitten was ultimately used for purposes of prosecution is totally collateral.

The evidence seized by BMCS Burton is, therefore, admissible under MRE 312(f) and the defense motion to suppress is denied.

Record at 54–55.

On appeal the appellant contends that the extraction of fluids violated the principles of *Rochin*, whereas the Government contends that the urinalysis results were properly admitted under the "valid medical purpose" rule, Mil.R.Evid. 312(f).

### III.

No urinalysis results were offered by the Government at trial. The only indication of what urinalysis results the parties were considering is in the appellant's motion to suppress wherein he alludes to the transportation of the specimen obtained by the senior chief to a Navy drug laboratory for testing and to the sample's allegedly testing positive for cocaine and marijuana. Appellate Exhibit I. Based on his essential findings, *supra*, it appears the military judge ruled on the admissibility of urinalysis results that might have been obtained on the specimen acquired by Senior Chief Burton. The military judge made no ruling respecting any results that might have been obtained on the specimen sent to the hospital's own laboratory.

It is the function of the military judge to ensure that the issues are focussed. *Cf. United States v. Brandell*, 35 M.J. 369 (C.M.A.1992); *see United States v. Nix*, 36 M.J. 660, 665 (N.M.C.M.R.1992). The better practice in litigating a motion to suppress is to have the relevant evidence offered. When the military judge rules on the motion, he or she then excludes, admits, or admits conditionally the precise item of evidence in issue. Such practice focusses the issues.

The practice employed here was in essence the solicitation and issuance of an advisory opinion from the military judge. The hazard in that practice is demonstrated in this case. There are *two* possible urinalyses—one performed by a Navy drug laboratory and one performed by the hospital laboratory. In my view, these items of evidence would be treated differently. In any case, based on the defense counsel's written motion, the military judge's essential findings, and the oral arguments of the parties, we are now concerned only with the urinalysis performed by a Navy drug laboratory on the specimen obtained by the investigator, and it is upon those results that the parties agree the appellant's prosecution is predicated. Therefore, for our purposes, any urinalysis that might have been performed by the hospital, itself, is not germane to the resolution of the issues in this case.

### IV.

Congress has authorized the President to promulgate rules of evidence applicable in trials by courts-martial. UCMJ art. 36(a), 10 U.S.C. § 836(a). Pursuant to that authority, the President has promulgated the Military Rules of Evidence. Under these rules all relevant evidence is admissible, except as otherwise provided by he Constitution of the United States as applied to members of the armed forces, the Uniform Code of Military Justice, the Military Rules of Evidence, the Manual for Courts–Martial, or any Act of

Congress applicable to members of the armed forces. Mil.R.Evid. 402. Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the members, or by a considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Mil.R.Evid. 403. Evidence that is not relevant is inadmissible. Mil.R.Evid. 402.

The results of a relevant urinalysis on a specimen obtained from an accused servicemember are potentially admissible under several of the rules of evidence, discussed in part *infra:* (1) the specimen was obtained by consent (Mil.R.Evid. 314(a), (e)); (2) the specimen was obtained upon probable cause pursuant to an authorization to search issued by competent authority (Mil.R.Evid. 312(d), 315); (3) the specimen was obtained upon probable cause under exigent and other special circumstances without prior authorization by competent authority (Mil.R.Evid. 312(d), 315(g)); (4) the specimen was obtained for a valid medical purpose irrespective of probable cause (Mil.R.Evid. 312(f)); (5) the specimen was obtained without probable cause, but in the course of an administrative inspection (Mil.R.Evid. 313); or, (6) the specimen was unlawfully obtained as a result of an unlawful search or seizure, however, the specimen would have been obtained even if the unlawful search or seizure had not been made (the "inevitable discovery" rule) (Mil.R.Evid. 311(b)(2)).

Under Mil.R.Evid. 311, evidence obtained as a result of an unlawful search or seizure made by a person acting in a governmental capacity is inadmissible against the accused if the accused makes a timely motion to suppress and the accused had a reasonable expectation of privacy in the person searched or when the accused would otherwise have grounds to object to the search or seizure under the Constitution of the United States as applied to the members of the armed forces.

A motion to suppress evidence on grounds of unlawful search or seizure is ruled on by the military judge, and the prosecution has the burden of proving by a preponderance of the evidence that the evidence was not obtained as a result of an unlawful search or seizure or that the evidence would have been obtained even if the unlawful search or seizure had not been made. Mil.R.Evid. 311(d)(4), (e)(1).

Evidence obtained from the non-consensual extraction of body fluids upon probable cause is admissible under certain circumstances.[3] In this regard, Mil.R.Evid. 312(d), *Extraction of Body Fluids,* provides:

> Nonconsensual extraction of body fluids, including blood and urine, may be made from the body of an individual pursuant to a search warrant or a [probable cause] search authorization under Mil.R.Evid. 315. Nonconsensual extraction of body fluids may be made without such warrant or authorization, notwithstanding Mil. R.Evid. 315(g) [probable cause searches without authorization under certain exigencies], only when there is clear indication that evidence of crime will be found and that there is reason to believe that the delay that would result if a warrant or authorization were sought could result in the destruction of the evidence. Involuntary extraction of body fluids under this rule must be done in a reasonable fashion by a person with appropriate medical qualifications.

According to the Analysis accompanying this rule, the foregoing provision "does not apply to compulsory production of body fluids (e.g., being ordered to void urine), but rather to physical extraction of body fluids (e.g., catheterization or withdrawal of blood)." Mil. R.Evid. 312 Analysis. *See also Murray v. Haldeman,* 16 M.J. 74, 82 (C.M.A.1983); *Stephen A. Saltzburg et al, Military Rules of Evidence Manual* 297 (3d ed. 1991).

Evidence obtained as a result of an intrusion into the body for a valid medical purpose, with or without probable cause, is also admissible under the rules. In this regard, Mil.R.Evid. 312(f), *Intrusions for Valid Medical Purposes,* provides:

> Nothing in this rule shall be deemed to interfere with the lawful authority of the

---

**3.** *See generally United States v. McClain,* 31 M.J.     130 (C.M.A.1990).

armed forces to take whatever action may be necessary to preserve the health of a servicemember. Evidence or contraband obtained from an examination or intrusion conducted for valid medical purpose may be seized and is not evidence obtained from an unlawful search or seizure within the meaning of Mil.R.Evid. 311.

According to the Analysis accompanying the Military Rules of Evidence, the results of a urinalysis of a urine specimen obtained through involuntary catheterization for the servicemember's immediate health needs would be admissible in a subsequent trial under this rule. Mil.R.Evid. 312(f) Analysis, 313(b) Analysis.

Relevant evidence obtained from inspections in the armed forces is also admissible. Mil.R.Evid. 313. An "inspection" under this rule includes an order to produce bodily fluids, such as urine, however, an examination made for the primary purpose of obtaining evidence at trial or other disciplinary proceedings is not an "inspection" within the rule. If the purpose of the examination is to locate contraband, and if it is directed immediately following a report of a specific offense and was not previously scheduled, or specific individuals are selected for examination, or persons are subjected to substantially different intrusions during the same examination, then before the evidence obtained from the examination may be admitted, the prosecution must prove by clear and convincing evidence that the examination was an inspection within the meaning of the rule. Mil.R.Evid. 313(b). Inspections must be conducted in a reasonable fashion and comply with Mil. R.Evid. 312, if applicable. Inspections may utilize any reasonable natural or technological aid. *Id.* An inspection may not be unduly humiliating or degrading. *Cf. Unger v. Ziemniak,* 27 M.J. 349 (C.M.A.1989) (an enlisted female's direct observation of a female officer donate a urine specimen was not unduly humiliating or degrading); *Murray v. Haldeman* (compulsory donation of a urine specimen for urinalysis was not conducted in an offensive manner or under circumstances which would tend to humiliate or degrade accused).

Finally, among the exceptions to the rule of inadmissibility of evidence obtained seized as a result of an unlawful search or seizure, is evidence that would have been obtained even if the unlawful search or seizure had not been made. Mil.R.Evid. 311(b)(2). This rule, "the inevitable discovery" rule, is based on *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), in which the United States Supreme Court held that "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means ... then the deterrence rationale [of the exclusionary rule] has so little basis that the evidence should be received." 467 U.S. at 444, 104 S.Ct. at 2509, *quoted in United States v. Allen,* 34 M.J. 228 (C.M.A.1992). Thus, if the prosecution proved that the seizure of contraband was inevitable through the exercise of proper police procedures authorized by proper authority despite the prior illegal search, the illegally seized evidence need not be excluded. *United States v. Kozak,* 12 M.J. 389 (C.M.A. 1982). In order to avail itself of this exception to the exclusionary rule, the prosecution must show "by a preponderance of the evidence, that there is (1) a reasonable probability that the contested evidence would have been discovered by lawful means in the absence of police misconduct and (2) that the government was actively pursuing a substantial alternate line of investigation at the time of the constitutional violation." *United States v. Kaliski,* 37 M.J. 105, 109 (C.M.A. 1993) (quotations omitted). In any case, the inevitable discovery rule must be applied carefully and narrowly, *United States v. Korda,* 36 M.J. 578 (A.F.C.M.R.1992), and "each case must be decided on its specific facts." *Kaliski,* 37 M.J. at 109.

## V.

In *Rochin,* the police broke into the appellant's bedroom and questioned him about the ownership of two capsules on a nightstand. Rochin placed the capsules in his mouth. Following an unsuccessful struggle with Rochin, the police took him in handcuffs to a hospital where at a police officer's direction, a doctor forced an emetic solution through a tube into Rochin's stomach. As a result of

this "stomach pumping" procedure, Rochin disgorged the capsules. The capsules were seized by the police. The capsules contained morphine. Rochin was convicted in a California Superior Court of possessing a preparation of morphine in violation of the California code. The chief evidence against Rochin was the two capsules admitted in evidence over his objection. 342 U.S. at 166, 72 S.Ct. at 206. The United States Supreme Court concluded that the foregoing conduct of the police "shocks the conscience" and reversed the state conviction brought about by this conduct because it offended the Due Process Clause of the Fourteenth Amendment to the Constitution. 342 U.S. at 172, 174, 72 S.Ct. at 209, 210.

Shortly after *Rochin* was decided by the Supreme Court, the Court of Military Appeals held *Rochin* was applicable in trials by court-martial. *United States v. Speight*, 5 U.S.C.M.A. 668, 18 C.M.R. 292, 1955 WL 3321 (1955); *United States v. Jones*, 5 U.S.C.M.A. 537, 18 C.M.R. 161, 1955 WL 3301 (1955); *United States v. Booker*, 4 U.S.C.M.A. 335, 15 C.M.R. 335, 1954 WL 2296 (1954); *Williamson*. In *Williamson*, a majority of our senior Court concluded that the extraction of urine by catheterization of an unconscious accused by medical personnel did not violate *Rochin*, however, in a concurring opinion, Judge Brosman allowed that had the evidence been obtained over the accused's protest, he would conclude "that fundamental standards of decency in law enforcement had been infringed, and that a conviction predicated in any part on such evidence violated the concept of 'military due process.'" 15 C.M.R. at 329. In a vigorous dissenting opinion, Judge Quinn was of the view that the unconscious state of the accused was immaterial, the real question being "whether or not an outside agency is justified in invading the sanctity of the human body without consent." 15 C.M.R. at 332. Moreover, as between the use of a stomach pump and a catheter, Judge Quinn found the latter to be more reprehensible. 15 C.M.R. at 334.

In *Jones*, the Court was presented with the case hypothesized by Judge Brosman in his concurrence a year earlier. Jones was confined for an unauthorized absence. He was observed acting strangely and was suspected of using drugs. The accused agreed to go to the dispensary. When other methods at securing a urine specimen from the accused failed, he was catheterized by a doctor over the accused's objection. An analysis of the urine obtained revealed the presence of morphine. The appellant was tried and convicted for wrongful use of morphine. Judges Quinn and Brosman joined to reverse on the basis of their views in *Williamson*. In *Speight*, a case with facts virtually identical to those in *Jones*, a unanimous Court again reversed the conviction. Judge Latimer, the dissenter in *Jones*, concurred in the result, observing that *Jones* "ended catheterization as a scientific method of crime detection" and further dissents by him served no useful purpose. 18 C.M.R. at 293.

In *Breithaupt v. Abram*, 352 U.S. 432, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957), the accused's pick-up truck was involved in an automobile accident with a passenger car on a New Mexico highway. Three persons in the passenger vehicle were killed. The unconscious accused was transported to a hospital where, at a state patrolman's request, a medical doctor extracted a blood specimen by means of a hypodermic needle. The specimen was given to the patrolman. The subsequent chemical analysis of the specimen for blood-alcohol content was admitted in evidence over the accused's objection in a state prosecution for manslaughter. The Supreme Court held that this method of obtaining evidence did not "shock the conscience" or offend a "sense of justice," as in *Rochin*, and did not violate the Due Process Clause of the Fourteenth Amendment. 352 U.S. at 434, 437, 77 S.Ct. at 409, 411.

In *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), the Supreme Court extended *Breithaupt* to a conscious accused and further held that the involuntarily extraction of a blood specimen at police request by a physician in a hospital environment according to accepted medical practices did not violate the Fourth Amendment's protection against unreasonable

searches and seizures, as applied to the States through the Fourteenth Amendment.[4]

In *Winston v. Lee*, 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985), the Supreme Court revisited *Schmerber* to consider whether a state may, consistent with the Fourth Amendment, compel an accused to undergo the surgical removal of a bullet in order to use it as evidence against him in a prosecution for attempted armed robbery. The Supreme Court concluded that the operation would intrude severely on the accused's privacy interests, that the medical risks, although apparently not extremely severe, were a subject of considerable dispute, that the state had failed to demonstrate a compelling need for the bullet, and that therefore the state had failed to demonstrate that it would be reasonable under the terms of the Fourth Amendment to search for evidence of the crime by means of the contemplated surgery. 470 U.S. at 766, 105 S.Ct. at 1619. In so holding, it stated:

> The Fourth Amendment is a vital safeguard of the right of the citizen to be free from unreasonable governmental intrusions into any area in which he has a reasonable expectation of privacy. Where the Court has found a lesser expectation of privacy, or where the search involves a minimal intrusion on privacy interests, the Court has held that the Fourth Amendment's protection are correspondingly less stringent. Conversely, however, the Fourth Amendment's command that searches be "reasonable" requires that when the State seeks to intrude upon an area in which our society recognizes a significantly heightened privacy interest, a more substantial justification is required to make the search "reasonable." Applying these principles, we hold that the proposed search in this case would be "unreasonable" under the Fourth Amendment.

470 U.S. at 767, 105 S.Ct. at 1620 (citations omitted).[5]

"It is now settled that the protections of the Fourth Amendment and, indeed, the entire Bill of Rights are applicable to the men and women serving in the military services of the United States unless expressly or by necessary implication they are made inapplicable." *United States v. Ezell*, 6 M.J. 307, 313 (C.M.A.1979). "This is not to say, however, that in its application the Fourth Amendment does not take into account the exigencies of military necessity and unique conditions that may exist within military society." *United States v. Middleton*, 10 M.J. 123, 127 (C.M.A.1981). "[W]hen it is suggested that a different rule should apply to military searches and seizures than those in the civilian community, some burden exists to show the need for such a variation." *Id.*

Thus, *Rochin's* fundamental principle that the due process of law, provided for in the Fifth Amendment as well as the Fourteenth Amendment, precludes prosecution on the basis of evidence obtained by force, brutal and insensitive to human dignity, is now a principle of military law. Likewise, in the absence of some showing of necessity for a different rule, the Fourth Amendment's protection against unreasonable searches and seizures applies to military personnel as in *Lee* to preclude invasive surgical procedures for the purpose of obtaining incriminating evidence. Inasmuch as these are constitutional principles applicable to trials by courts-martial, the Military Rules of Evidence must be construed in harmony with them. *Cf. United States v. Kossman*, 38 M.J. 258 (C.M.A.1993); *United States v. Clemons*, 16 M.J. 44, 49 (Judge Everett concurring).

## VI.

On appeal, this Court may at its discretion review a trial judge's evidentiary rulings applying an abuse of discretion standard or, alternatively, it may review them *de novo*. See *United States v. Cole*, 31 M.J. 270 (C.M.A.1990). While we are generally inclined to defer to a trial judge's essential

---

4. *Schmerber* has been applied to trials by courts-martial. *See United States v. Bickel*, 30 M.J. 277 (C.M.A.1990); *United States v. Armstrong*, 9 M.J. 374 (C.M.A.1980).

5. In so holding, the Court also took note of its prior holding in *Rochin*: "*Rochin*, recognizing the individual's interest in 'human dignity,' held the search and seizure unconstitutional under the Due Process Clause." 470 U.S. at 762 n. 5, 105 S.Ct. at 1617 n. 5.

findings of fact on a motion to suppress evidence, we are not bound by them. *United States v. Jones*, 34 M.J. 899 (N.M.C.M.R. 1992). In any case, the trial judge's essential findings will not be given deference when they are not supported by any evidence of record or when they are clearly erroneous. *See United States v. Cummings*, 21 M.J. 987 (N.M.C.M.R.1986). Moreover, there is no deference as to questions of law. *Cf.* UCMJ art. 66(c), 10 U.S.C. § 866(c).

### VII.

As noted above, there are six potential bases upon which the results of the urinalysis may have been admitted: (1) a consent search; (2) a search authorized upon probable cause; (3) a search upon probable cause without authorization, but under exigent and special circumstances; (4) an inspection; (5) an intrusion for a valid medical purpose; and (6) inevitable discovery.

The admissibility of the test results on the basis of consent or an administrative inspection may be summarily rejected. The record before us clearly demonstrates that the appellant adequately registered his objection and no one seriously contends he consented. Similarly, the evidence was not obtained on the basis of an administrative inspection. Extraction of body fluids, as distinguished from the production of body fluids, is not contemplated as an administrative inspection within Mil.R.Evid. 313. To the contrary, extractions of body fluids, to the extent they may be constitutionally performed at all, must qualify under Mil.R.Evid. 312. Additionally, the evidence suggests the command investigator acquired his specimen for the primary purpose of obtaining evidence for use at trial or other disciplinary proceedings, and the conduct of administrative inspections of servicemembers by means of catheterization would unquestionably be unduly humiliating and degrading. *Unger; Murray*, 16 M.J. at 81. Again, no one seriously suggests the evidence was obtained as a result of an inspection.

I am also unpersuaded that the record shows the evidence was procured as a result of a command authorized extraction of body fluids under Mil.R.Evid. 312(d) and 315.

Firstly, I reiterate the record does not reflect what was authorized or who authorized it. Even if we assume that the appellant's commanding officer authorized the seizure of a urine specimen, as appellant states in his trial brief, there is nothing in the record to show that the commanding officer authorized search and seizure by catheterization. Equally probable, the commanding officer contemplated the appellant would be ordered to produce a specimen and, if necessary, obliged to consume fluids and void in nature's good time without resort to intrusive measures. Neither the commanding officer nor the legal officer were called to set these matters to rest. One may infer that this information, which presumably was within their possession, would have been produced by the Government at trial if it had been favorable to the Government's interests.

More to the point, our senior Court has already stated with clarity that obtaining evidence from an accused by use of a catheter over his protest infringes upon fundamental standards of decency in law enforcement and a conviction predicated *in any part* on such evidence violates the concepts of due process. *Williamson*, 15 C.M.R. at 329 (Judge Brosman concurring); *Speight; Jones*. We are not free to ignore this precedent. *See United States v. Jones*, 23 M.J. 301 (C.M.A.1987).

Nothing in the 40 years since the *Williamson* line of cases was decided has transpired in civilized society to render search and seizure by catheterization less offensive to fundamental standards of decency. The observations of Judges Brosman and Quinn concerning this procedure ring as true today as they did when these cases were decided. If anything, the testimony taken in this case confirms the observations of Judge Brosman in *Williamson*:

> In the first place, catheterization involves infinitely more physical discomfort than the mere pricking of a suspect's finger— although it is perhaps not so painful as the dissenting judge [Judge Quinn] implies. The degree of distress caused by this medical procedure—I am informed—will depend on a number of factors, principally the suspect's threshold of pain, his nervousness and tension at the time, and the

skill of the operator. Second, at least some slight risk of urinary tract infection is associated with the challenged operation. In this regard, a mitigating circumstance would be present, of course, if the extraction were performed—as in the instant case—by a qualified physician. A third—and to my mind a most important factor—is the psychological impact potential possessed by this type of scientific exploration. The extraction of the fluid is, of course, from the male reproductive organ. Subconscious fears associated with this area are substantial—indeed so great that many schools of psychoanalysis place special emphasis on the role of the "fear of castration." In addition, an accused might well entertain distinctly conscious fears of infection from the operation. Finally, if forcible catheterization were permitted, a sublimated "third degree"—one embracing pseudoscientific menaces—might easily result. By this I mean to suggest that the fear of injury to the organs concerned is so massive and pervading that a suspect might tend to choose confession as a route of escape from the threat of catheterization.... In light of these considerations, I must hold that the forcible extraction of urine from a protesting accused is as noxious as the use of a stomach pump.

15 C.M.R. at 329.

The humiliation and indignity of the process here is patent. Over his protest the appellant was subjected to the manipulation of his genitals by a female nurse and to the discomforting, if not painful, insertion and maintenance of a tube therein in full view of a crowd of onlookers, not all of whom were medical personnel.

The fact that the procedure was accomplished by someone who is medically trained is a consideration, but it is not dispositive. The procedures employed in *Rochin, Williamson, Jones, Speight,* and *Lee* were all performed or to be performed by medical doctors.

If we assume the catheterization was authorized by the appellant's commanding officer, an assumption we may not fairly make on the evidence of record, the fact of authorization would not render the procedure of obtaining evidence by catheterization over a subject's protest less violative of the standards of decency. A prosecution predicated on action offensive to the sense of justice is no less so because the commanding officer authorized it. *Cf. Lee. See, e.g., People v. Scott,* 21 Cal.3d 284, 145 Cal.Rptr. 876, 578 P.2d 123 (1978) (court-ordered bodily intrusion, which consisted of massaging the prostrate gland to obtain a semen sample, was regarded as extreme as regurgitation in *Rochin*).

I am also unable to find in the record evidence supporting the military judge's essential finding that "BMCS Burton was directed to try to obtain a sample of Petty Officer Fitten's urine by consent, if possible, or by execution of a search authorization if necessary, but only *with the tacit understanding* that Petty Officer Fitten was being catheterized for diagnostic purposes anyway." Record at 54–55 (emphasis added). Specifically, I am unable to find any evidence that the appellant's commanding officer was informed that the appellant would be catheterized for diagnostic purposes anyway or how the commanding officer might have come to understand such, tacitly or otherwise.

In short, based on the principles of due process of law embodied in the Fifth Amendment, as applied to the military according to *Williamson* and its progeny, I would hold, as our senior Court binds us to do, that obtaining a urine specimen by catheterization cannot be sanctioned under Mil.R.Evid. 312(d), as a probable cause search, with or without command authorization. *A fortiori,* a search and seizure by catheterization is *per se* unreasonable under Fourth Amendment analysis. If the results of the urinalysis of this specimen may be admitted, admission must be justified on other bases entirely. I turn, therefore, to the "valid medical purposes" rule, Mil.R.Evid. 312(f), upon which the Government rests as the basis for admitting the urinalysis results in this case.

The appellant does not contest the proposition that servicemembers may be subjected to invasive medical procedures against their will when necessary to preserve the servicemember's health. Nor does he contest the

notion that incriminating evidence obtained in the course of such procedures may be used against in trials by courts-martial. In fact, very recently the United States Court of Military Appeals held that the results of chemical analysis on blood drawn in an emergency room for diagnostic purposes would be admissible under Mil.R.Evid. 312(f), even though the results did not actually affect the accused's treatment. *United States v. Maxwell,* 38 M.J. 148, (C.M.A.1993).

We have been cited no reported military case, other than those cited above, that prescribes the limits of what Government medical personnel may do over the objection of military patients.[6] I do note, however, that the Manual of the Medical Department, U.S. Navy, provides:

**Compulsory Medical or Surgical Treatment (Regulatory)**

(1) By authority delegated by the Secretary of the Navy, and with the *approval of the commanding officer, the senior medical ... officer ...* of a ship or station, after consultation with *other medical ... officers* if available, will, where in the medical officer's judgment the best interests of the individual or of the service require, take the following measures with or without the consent of the individual concerned:

(a) Emergency care required to preserve the life or health of the member.

(b) Care necessary to protect the life or health of a member who is considered by a *psychiatrist* to be mentally incompetent.

\* \* \*

MEDMAN, ¶ 2–18 (emphasis added).[7] I reiterate, the record before us is unclear on the question of what, if any, medical officer actually authorized the catheterization. The military judge correctly pointed out there was no evidence that the appellant's commanding officer did. Quite clearly, there is no evidence that the senior medical officer or any psychiatrist at Balboa Naval Hospital authorized a compulsory catheterization.

Whatever the limits may be on the authority of medical personnel, vis-a-vis nonconsenting military personnel, it cannot be doubted that the acquisition of incriminating evidence by Government doctors through invasive procedures and its subsequent use in the patient's prosecution may only be sustained without implicating due process concerns if the "valid medical purpose" exception is confined to its bounds. Disciplinary authorities may not strip the accused of his constitutional rights by merely donning a white coat or by calling upon medical personnel to do it for them. *See Rochin; Jones; Speight; Lee.* Stating the obvious: Once the valid medical purpose for an intrusion ceases, the admission of evidence taken thereafter by means of an ongoing intrusion can no longer be justified on the basis of medical necessity.

The appellant argues, and I agree, that the specimen obtained by the investigator was not used for any medical purpose, valid or otherwise, nor was it drawn in contemplation of any such purpose. When the investigator's specimen was drawn, the specimen arguably drawn for medical purposes had already been taken. According to the Government's own witness, Dr. Woods, "As soon as the urine sample is obtained in a case like this, the catheter is generally withdrawn.... It can be left in other cases." Record at 14. Once the medical purpose for the catheterization and the extraction had ceased, the appellant was entitled to have the procedure stopped and the apparatus immediately removed. When the nurse left the apparatus in the appellant's penis and bladder for the purpose of drawing more urine for the investigator, she was not acting for any valid medical purpose and the scenario *eo instante* became that condemned in *Williamson* and its progeny.

One arrives at the same conclusion with either the scenario testified to by Ms. Broadwell or that testified to by the investigator.

---

6. Such authority would likely be limited to the least invasive procedure necessary under the circumstances of the moment according to medical judgment, and would not extend to invasions simply as a matter of convenience.

7. See *United States v. Cooper,* 35 M.J. 417 (C.M.A.1992) and cases cited therein for a discussion of the consequence of an agency's failure to follow its own regulation.

The investigator injects one additional factor, however. He testified that the nurse stated she had more urine than she needed for hospital purposes in the first specimen she had drawn and she poured some of that specimen into the one she gave to the investigator. This scenario suggests that the nurse had extracted more urine than was reasonably necessary for a valid medical purpose.[8] In any case, from the outset the nurse was embarking on two missions—draw a specimen for the hospital and draw a specimen for the investigator. Only the one that went to the hospital could arguably be covered under the valid medical purposes rule, and that specimen is not a consideration on the record of this case.

Finally, one must address the question of "inevitable discovery," reminded that the rule must be applied narrowly and carefully. The Government made no attempt to establish the admissibility of the urinalysis results on the basis of inevitable discovery. Whether or not a urine specimen would inevitably have been procured by the Government through lawful means was not established. Nor did the Government prove it was actively pursuing a substantial alternate line of investigation at the time of the constitutional violation. Moreover, we have not been cited to any authority that would apply the "inevitable discovery" rule to evidence seized as a result of a *Rochin* due process violation. Rather, the "inevitable discovery" rule appears to have been applied only to technical Fourth Amendment violations. Surely the inevitable discovery rule may not excuse a prosecution based on police conduct that infringed fundamental standards of decency. Accordingly, I conclude the "inevitable discovery" exception, Mil.R.Evid. 311(b)(2), is unavailable here.

### VIII.

Based on the foregoing, I would hold the military judge abused his discretion in failing to suppress test results of a urinalysis conducted upon urine obtained by the base in-

vestigator by means of catheterization over the appellant's protest. Inasmuch as the appellant's pleas of guilty to the drug offenses were entered conditionally pursuant to R.C.M. 910(a)(2), I would set aside the findings of guilty and sentence. The civil rights of American citizens are understandably curbed when they embark upon service in the armed forces of their country, but no provision of the Constitution or the Code countenances searching their bladders for incriminating evidence in the name of good order and discipline.[9] Here is where common decency and the Constitution demand we draw the line.

---

8. The record does not indicate whether the portion of urine she shared, if any, was sufficient in and of itself for purposes of drug laboratory testing.

9. *See* UCMJ art. 93, 10 U.S.C. § 893.