504

UNITED STATES, Appellant,

v.

Walter S. STEVENSON, 308–70–4093, Hospital Corpsman Third Class (E–4), U.S. Navy (Retired), Appellee.

NMCM 9900769.

U.S. Navy–Marine Corps Court of Criminal Appeals.

10 Oct. 1999.

LT Timothy E. Curley, JAGC, USNR, Appellate Government Counsel.

Capt Michael Tencate, USMC, Appellate Government Counsel.

LT M. Eric Eversole, JAGC, USNR, Appellate Defense Counsel.

LT Omar R. Lopez, JAGC, USNR, Appellate Defense Counsel.

TROIDL, Senior Judge:

On 5 February 1999, a charge alleging that the appellee committed rape on or about 23 November 1992, in violation of Article 120, Uniform Code of Military Justice, 10 U.S.C. § 920 (1994), was referred for trial by a general court-martial. Following arraignment, the appellee filed a motion to suppress "DNA [deoxyribonucleic acid] evidence obtained from an illegal blood seizure." Appellate Exhibit VII. The motion was duly litigated and, on 27 April 1999, the military judge granted the motion. Trial counsel provided timely notice of the Government's intent to appeal the military judge's ruling and the Government subsequently filed a timely appeal under Article 62, UCMJ.

After the Government filed its brief asserting a single assignment of error,[1] the appellee submitted an Answer in which he asserted one additional assignment of error[2] as providing "additional or alternate grounds for affirming the [military judge's] ruling." *United States v. Lincoln,* 42 M.J. 315, 320 (1995) (quoting *Dandridge v. Williams,* 397 U.S. 471, 475–76, n. 6, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970)). The Government subsequently moved to dismiss the additional assignment of error as being outside the jurisdiction of this court. Having carefully considered the record of trial, the Govern-

ment's Brief, the appellee's Answer, the Government's Reply and Motion, and the superb oral arguments by appellate counsel, we grant the Government's motion to dismiss the additional assignment of error, finding that the statute of limitations does not provide an "additional or alternate" grounds for affirming a suppression ruling. Additionally, we affirm the military judge's ruling suppressing the second tube of blood drawn from the appellee on 6 June 1998, along with any derivative evidence gained therefrom.

## Standard of Review

■ This Court may review the military judge's determinations "only with respect to matters of law." Art. 62(b), UCMJ; RULE FOR COURTS-MARTIAL 908, MANUAL FOR COURTS-MARTIAL, UNITED STATES (1998 ed.). "[R]eversal of an interlocutory ruling of a military judge can only result where that judge committed an error of law." *United States v. Postle,* 20 M.J. 632, 636 (N.M.C.M.R.1985). We are bound by the military judge's determinations of fact unless they are "unsupported by the evidence of record or was clearly erroneous." *United States v. Middleton,* 10 M.J. 123, 133 (C.M.A. 1981). We conduct a *de novo* review of his conclusions of law.

## Findings of Fact

We start by adopting findings of fact 1–13 and 15–25, as contained in the military judge's ruling of 27 April 1999, finding that they are supported by the evidence of record and are not clearly erroneous. *Id.* We decline to adopt finding of fact 14, finding no evidence in the record that NCIS was notified in advance that the appellee's "blood would be drawn on 3 June 1998 in connection with a routine medical visit."

The findings of fact reveal that Mrs. [KT], the dependent wife of a Sailor, complained to authorities that she was violently raped at knifepoint in her on-base residence in Ha-

1. THE MILITARY JUDGE ERRED IN SUPPRESSING DNA EVIDENCE FROM THE ACCUSED'S BLOOD. SINCE THE ACCUSED WAS A MEMBER OF THE MILITARY ON THE TEMPORARY DISABILITY RETIRED LIST AND HIS BLOOD WAS ALREADY BEING DRAWN FOR A VALID MEDICAL PURPOSE, THE DNA

EVIDENCE IS ADMISSIBLE UNDER MIL. R.EVID. 312(f).

2. THIS COURT MUST DISMISS THE CHARGE OF RAPE WITH PREJUDICE BECAUSE THE STATUTE OF LIMITATIONS FOR THE CRIME HAS EXPIRED.

waii, on 23 November 1992. Blood and semen samples were obtained during a subsequent medical examination of Mrs. [KT]. The petitioner was an active duty petty officer stationed in Hawaii at the time of the attack. The Naval Criminal Investigative Service [NCIS] closed the investigation into the rape of Mrs. [KT] as unresolved in August 1993. In 1994, the petitioner was released from active duty and placed on the Temporary Disability Retired List [TDRL].[3] The Government did not establish the basis for the appellee's assignment to the TDRL during the litigation of this motion.

In November 1997, after reviewing police reports which implicated the appellee as a suspect in a "Peeping Tom" incident that occurred in the vicinity of Mrs. [KT's] residence and within the general timeframe of the alleged rape, NCIS reopened the rape investigation. Thereafter, NCIS Special Agent [SA] McNutt, assigned to the NCIS office in Memphis, Tennessee, received a lead from the NCIS office in Hawaii asking him to interrogate the appellee and to ask the appellee to provide NCIS with a sample of his blood.

After learning that the appellee was receiving medical treatment at the Veteran's Administration [VA] Hospital in Memphis, SA McNutt contacted the VA and was allowed to review the appellee's medical records. During this review, SA McNutt learned that the appellee was being treated for diabetes and a mental disorder. Concerned for his safety and that of the appellee, SA McNutt decided it was premature to contact the appellee about the investigation. Instead, SA McNutt obtained the appellee's blood type from the VA and conveyed this information to the NCIS headquarters. Comparison of the appellee's blood type to the information obtained from the blood and semen samples obtained during the 1992 medical examination of Mrs. [KT] did not eliminate the appellee as a suspect in the rape investigation.

Again asked to obtain a specimen of the appellee's blood and recognizing that the appellee received routine treatment at the VA Hospital, which included drawing blood to monitor his diabetes, SA McNutt contacted and requested the assistance of Mr. Ron Dooley, the Regional Counsel for the VA. SA McNutt informed Mr. Dooley that the appellee was a suspect in a rape investigation and asked if NCIS could obtain a specimen of the appellee's blood whenever he might present himself at the VA Hospital in the normal course of his treatment. Stating that the VA routinely provided blood specimen to the police in connection with DUI investigations, Mr. Dooley said that it should be possible for the VA to comply with the NCIS request. However, Mr. Dooley requested that NCIS submit a memo formalizing the requested assistance. The memo, which requested that NCIS be notified the next time the appellee presented to the VA Hospital to have his blood drawn, was prepared on or about 21 May 1998 and was faxed to the VA Hospital in Memphis on 27 May 1998.

On 3 June 1998, the appellee appeared at the VA Hospital in Memphis for a regularly scheduled medical visit and consented to having blood drawn for the purpose of medical treatment. The medical staff inserted a vacuum needle (with an open end) into the appellee's arm, then affixed a tube to the needle and drew blood for medical purposes. The medical staff then removed the first tube and, within five or six seconds, affixed a second tube to the needle for the sole purpose of obtaining the blood specimen requested by NCIS. After the second specimen had been obtained, the vacuum needle was removed from the appellee's arm.

The appellee's 3 June 1998 visit to the VA Hospital was not instigated by NCIS and NCIS did not have a representative present when either tube of blood was drawn. NCIS was notified of the availability of the blood specimen and secured it from the VA Hospital on 3 June 1998. The specimen was then forwarded to a laboratory for comparison with the forensic evidence obtained from

---

3. The TDRL is "a list maintained by the CNO [Chief of Naval Operations] or CMC [Commandant of the Marine Corps] of members who are UNFIT FOR DUTY because of physical disabili-

ty" and "whose disabilities are not yet determined to be stabilized or permanent." Secretary of the Navy Instruction 1850.4C, Part G, ¶ 1044 (Ch–I, 22 July 1993)(emphasis in original).

Mrs. [KT].[4] The specimen contained in the second tube was not used for any medical purpose.

The appellee was not aware of the purpose underlying the drawing of the second tube of blood and did not authorize the medical personnel to draw his blood for any purpose other than medical treatment. The Government concedes that the blood drawn into the second tube on 3 June 1998 was not obtained pursuant to a consent search, a search authorization based upon probable cause, or upon probable cause but without a search authorization and under exigent or special circumstances.

On 9 October 1998, the Secretary of the Navy authorized the trial of the petitioner, as a retiree, for the rape of Mrs. [KT]. The appellee was apprehended on 17 December 1998 and ordered into pretrial confinement. A single specification alleging that the petitioner raped Mrs. [KT] was referred by Commander, Navy Personnel Command, for trial by general court-martial on 5 February 1999. The petitioner was arraigned on 17 February 1999. On 18 March 1999, the petitioner moved to suppress the second tube of blood drawn at the VA hospital on 3 June 1998. Appellate Exhibit VII. After the fil-

ing of the Government's Response and the appellee's Reply thereto (Appellate Exhibits VIII and IX), an Article 39(a), UCMJ, session was held on 24 March 1999, during which evidence on the motion was presented. Record at 1–45. On 27 April 1999, the military judge granted the appellee's motion, suppressing the vial of blood and any derivative evidence gained therefrom, ruling that Military Rule of Evidence 312(f), MANUAL FOR COURTS-MARTIAL, UNITED STATES (1998 ed.) was inapplicable in this case and that the search and seizure violated both the Fourth and Fifth Amendments to the Constitution.

The Government thereafter filed a timely notice of appeal of the military judge's ruling.[5] On appeal, the Government asserts that the military judge abused his discretion in suppressing the evidence at issue, his ruling having been based upon an erroneous understanding of the law. The appellee argues that the Military Rules of Evidence do not apply in this case, that the search and seizure violated the Fourth Amendment, and would have us affirm the military judge's suppression ruling.

### Applicability of the Military Rules of Evidence

Preliminarily, we find that the Military Rules of Evidence do apply in this case, as

---

4. On 4 August 1998, the laboratory reported that the DNA profiles developed from the November 1992 forensic evidence were attributable to Mrs. [KT], the appellee, and one unknown individual.

5. Following the Government's filing of its Notice of Appeal, the appellee filed a Motion for Appropriate Relief with the trial military judge requesting review of his continued pretrial confinement. After the military judge ruled that he did not have the authority to hear the motion during the pendency of the appeal, the appellee petitioned us for a *Writ of Habeas Corpus* or, in the alternative, a *Writ of Mandamus*. We recently denied the petition for a *Writ of Habeas Corpus*, but issued a *Writ of Mandamus* in which we ordered the military judge to review the propriety of the appellee's continued pretrial confinement. In our order, we held that:

Having considered the evolution of R.C.M. 908(b)(4)(A) and (b)(9), we find that the military judge was incorrect in concluding that he was barred from hearing the petitioner's request for release from confinement pending the Government appeal. Although R.C.M. 908(b)(4)(A), both as originally drafted and subsequently amended, precludes sessions of court pending resolution of the appeal as to

matters related to the offense(s) impacted by the military judge's ruling, we find that the review of an individual's pretrial confinement status does not impact the charges and specifications pending resolution of the appeal. As we stated in *Frage v. Edington*, 26 M.J. at 928, 'under normal circumstances, the decision whether to confine an accused during the pendency of a Government appeal rests within the discretion of the convening authority and the military judge in accordance with the guidelines set forth in R.C.M. 305(d).' R.C.M. 908(b)(9) does not change this view, since it merely tells the accused's commander what factors he should consider in deciding whether or not to continue pretrial confinement during the pendency of an appeal. We find that this subsection does not explicitly preclude action by the military judge and, since it is modeled after 18 U.S.C. § 3143, it implicitly seeks to ensure that an accused in pretrial confinement pending a Government appeal is in the same position as any other pretrial detainee, to include review by a military judge in accordance with R.C.M. 305(j).

*Stevenson v. Krantz and Hinkle*, No. 9900769 (N.M.Ct.Crim.App. 27 Aug. 1999) (unpublished order)(footnotes omitted).

they do in every court-martial. *See* MIL. R.EVID. 101 and 1101. We also agree with the military judge that the extra tube of blood was drawn by VA medical personnel solely in response to the memorandum from NCIS, and thus they acted as agents for NCIS when they performed that procedure. As a result, the search and seizure of the second tube of blood was "conducted, instigated, or participated in by" military personnel or their agents and the search or seizure is unlawful if "in violation of the Constitution of the United States as applied to members of the armed forces, an act of Congress applicable to trials by court-martial that requires exclusion of evidence obtained in violation thereof, or Mil.R.Evid. 312–317." MIL. R.EVID. 311(c)(1).

■ Both the Fourth and Fifth Amendments provide protections in the area of searches and seizures and are generally applicable to the military absent, a showing of a need for variation based upon military exigencies. *Murray v. Haldeman,* 16 M.J. 74, 81 (C.M.A.1983)(quoting *United States v. Middleton,* 10 M.J. 123, 127 (C.M.A.1981)); *see also United States v. Fitten,* 42 M.J. 179, 180 (1995). The Fourth Amendment provides:

The right of the people to be secure in their

persons, houses, papers, and effects, against unreasonable searches and seizures,

shall not

be violated, and no Warrants shall issue, but

upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Compliance with the Due Process Clause of the Fifth Amendment is an issue when a search or seizure is conducted in such a way that it does "more than offend some fastidious squeamishness or private sentimentalism about combating crime too energetically" but rather "is conduct that shocks the conscience." *Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952).

The Supreme Court has been particularly sensitive to cases involving bodily intrusions, stating in *Schmerber v. California,* 384 U.S. 757, 768, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), that "the Fourth Amendment's proper function is to constrain not all intrusions as such, but against intrusions which are not justified in the circumstances." The Court went on to write that the "interests in human dignity and privacy which the Fourth Amendment protects forbid any such intrusions on the mere chance that the desired evidence might be obtained." *Schmerber,* 384 U.S. at 770, 86 S.Ct. 1826.

Against this backdrop, Section III of the Military Rules of Evidence established exclusionary rules and related matters concerning self-incrimination, search and seizure, and eyewitness identification. Of interest in this case are Rules 311 through 316. The appellee, having made a timely motion to suppress [Mil.R.Evid. 311(a)(1) ] and having an adequate interest in both his person and in the blood seized [Mil.R.Evid. 311(a)(2)], the burden is on the Government to establish, by a preponderance of the evidence, that the appellee's blood was not obtained as a result of an unlawful search and seizure. MIL.R.EVID. 311(e).

The Government concedes that the search and seizure in this case was not accomplished pursuant to a search authorization and we concur with the military judge that the evidence presented by the Government did not amount to probable cause. MIL.R.EVID. 315 and 316. Additionally, as conceded by the Government, the second tube of blood was not obtained based upon the consent of the appellee, or upon any of the other available searches not requiring probable cause as enumerated in Mil.R.Evid. 314. The sole basis offered by the Government for the admissibility of the second tube of blood and the derivative evidence obtained therefrom is that it was obtained as a result of an intrusion conducted for a valid medical purpose, as authorized by Mil.R.Evid. 312(f).[6]

---

6. Mil.R.Evid. 312(f) reads as follows:

*Intrusions for valid medical purposes.* Nothing in this rule shall be deemed to interfere with

## Mil.R.Evid. 312(f)

The military judge ruled that Mil.R.Evid. 312(f) "is limited in scope and should be narrowly construed to apply only to members of the 'active duty' armed forces." Ruling on the Motion to Suppress of 27 April 1999, Discussion, ¶ 6. He went on to restate his holding, albeit somewhat differently, in his summation, stating that Mil.R.Evid. 312(f) was "inapplicable to retired servicemembers on [the] TDRL list, at least to the extent that the medical examination or intrusion was conducted for purposes other than ascertaining the status of a member's medical condition vis-à-vis return to an active duty status." *Id.* at ¶ 8a. The military judge also held that the search and seizure in this case violated the appellee's rights under both the Fourth and Fifth Amendments to the Constitution.

■ Mil.R.Evid. 312(f) seeks to make reasonable, within the context of the Fourth Amendment, the search for and seizure of evidence obtained from a bodily intrusion conducted for a valid medical purpose without a search authorization or probable cause. The reason cited as providing the foundation for the rule is the lawful authority of the armed forces to take whatever action is necessary to preserve the health of a servicemember. This Rule is without parallel in the Federal Rules of Evidence and recognizes the special needs of the armed forces. We accept that the armed forces have a valid need to be able to take actions necessary to preserve the health of active duty servicemembers, all of whom are counted upon to ensure the military is able to carry-out its mission in peacetime or during periods of armed conflict. Accordingly, unlike the civilian populace, active duty servicemembers capable of making health care decisions related to their own bodies may be required to accept medical treatment believed by their superiors to be necessary to preserve their health even over objections and without judicial intervention. *See United States v. Fitten,* 39 M.J. 659, 661, 676–77 (N.M.C.M.R. 1993), *aff'd,* 42 M.J. 179 (1995). As was the

case in *Fitten,* even if this medical treatment involves an intrusion into the body, so long as it is conducted for a valid medical purpose, by individuals with appropriate medical qualifications, and in an appropriate medical setting, the intrusion will not amount to an unreasonable search and seizure in violation of the Fourth Amendment. Additionally, if the intrusion itself does not shock the conscience, there is no violation of the Due Process Clause of the Fifth Amendment.

■ The plain language of Mil.R.Evid. 312(f) does not limit its applicability to active duty servicemembers. Unlike the military judge, we will not look behind the plain meaning of this language in an attempt to discern whether the President intended the rule to apply to members of the TDRL. *See United States v. Leonard,* 21 M.J. 67, 69 (C.M.A.1985); *United States v. Ferguson,* 40 M.J. 823, 830 (N.M.C.M.R.1994). We must, however, determine whether application of the rule to members of the TDRL would be "in violation of the Constitution." Mil. R.Evid. 311(c)(1).

In making this determination, we look to both the statutes governing retirement or separation from the armed forces by reason of physical disability, to include assignment to the TDRL, and the Navy policy implementing those statutes. 10 U.S.C. §§ 1201–1221 (1999); Secretary of the Navy Instruction 1850.4C (Ch. 1, 22 July 1983). In administering the TDRL for the Navy, the Chief of Naval Personnel is tasked with maintaining an accurate accounting of authorized members, designating medical facilities and directing members to undergo periodic physical examinations, and monitoring failures to report to the required examinations. SECNAVINST 1850.4C at Enclosure (7), ¶ 7002. Individuals on the TDRL are required to maintain a current address with the Finance Center and submit to periodic physical examinations ordered by the Chief of Naval Personnel. *Id.* at ¶¶ 7003 and 7005. If an individual fails to comply with an order for a physical examination, the Chief of Naval Per-

---

the lawful authority of the armed forces to take whatever action may be necessary to preserve the health of a servicemember. Evidence or contraband obtained from an examination or

intrusion conducted for a valid medical purpose may be seized and is not evidence obtained from an unlawful search or seizure within the meaning of Mil.R.Evid. 311.

**510**

sonnel may either accept a substitute examination, or take a series of actions starting with a stoppage in pay, followed by administrative removal from the TDRL and ultimately the administrative discharge of the individual. *Id.* at ¶¶ 7006 and 7008; 10 U.S.C. § 1210(a). Enlisted members of the TDRL who submit to the periodic examinations and are found fit for duty, cannot be ordered back to active duty without their consent and even then only if they are otherwise qualified for reenlistment. SECNAVINST 1850.4C. at Enclosure (7), ¶ 7019; 10 U.S.C. § 1211.

 Based upon the statutes and policy guidance governing the TDRL, we find that: 1) the armed forces do not rely upon members of the TDRL to carry-out their mission even though they remain servicemembers and are subject to both the UCMJ and trial by court-martial; 2) the armed forces do not have the same need to be able to take actions necessary to preserve the health of members of the TDRL as they have for active duty servicemembers; 3) members of the TDRL are not subject to involuntary medical treatment believed to be necessary to preserve their health to any extent greater than the general populace; and, 4) there is no showing that the application of Mil.R.Evid. 312(f) to members of the TDRL is a needed exception to the Fourth Amendment protections applicable to the general populace based upon military exigencies. Applying the Fourth Amendment to the facts in this case and in view of the inapplicability of Mil.R.Evid. 312(f) to the appellee, we find that the search and seizure conducted in this case was unreasonable.

Accordingly, we find that the military judge was correct in his ruling that Mil. R.Evid. 312(f) is not applicable to members of the TDRL and that the search and seizure in this instance was unreasonable, thus violating the Fourth Amendment. We do not find, however, a violation of the appellee's rights under the Due Process Clause of the Fifth Amendment.

### Disposition

We affirm the military judge's ruling suppressing the specimen of blood drawn for NCIS on 6 June 1998 and any derivative evidence gained therefrom. We return the record for a trial on the merits.