UNITED STATES

v.

**Rico S. GORE, Equipment Operator Constructionman (E–3), U.S. Navy.**

NMCM 200300348.

U.S. Navy–Marine Corps Court of Criminal Appeals.

Decided 29 May 2003.

LT Colin A. Kisor, JAGC, USNR, Appellate Defense Counsel.

LT Marcus N. Fulton, JAGC, USNR, Appellate Defense Counsel.

LT Frank L. Gatto, JAGC, USNR, Appellate Government Counsel.

CDR R.P. Taishoff, JAGC, USN, Appellate Government Counsel.

Before PRICE, Senior Judge, CARVER, and RITTER, Appellate Military Judges.

PRICE, Senior Judge:

The case before this court is an interlocutory appeal by the Government, pursuant to Article 62, Uniform Code of Military Justice, 10 U.S.C. § 862 and RULE FOR COURTS-MARTIAL 908, MANUAL FOR COURTS-MARTIAL, UNITED STATES (2002 ed.). The Government contends that the military judge erred as a matter of law when he: (1) concluded that the convening authority unlawfully influenced the court-martial proceedings; and (2) dismissed all charges and specifications with prejudice. We hold that the military judge did not err in his conclusion, but did err in his choice of remedy.

### Procedural Posture of Case

The appellee is charged with two specifications of desertion and one specification of unauthorized absence, in violation of Articles 85 and 86, UCMJ, 10 U.S.C. §§ 885 and 886. The appellee was placed in pretrial confinement on 3 September 2002. The charges were preferred and referred to a special court-martial on 10 September 2002. The appellee was arraigned on 19 September 2002 and trial was scheduled for 12 November 2002. Following arraignment and before the next session of court, the appellee and convening authority (CA) entered into a pretrial agreement. The next session of court was actually held on 21 November 2002. At that Article 39(a), UCMJ, session, the appellee successfully litigated a motion to dismiss all charges for unlawful command influence.

The Government notified the military judge, on 22 November 2002, of its intent to appeal his ruling. The Government then moved, on 16 December 2002, to docket the record of trial with this court. On 18 December 2002, the Government further moved to remand the case to the military judge to articulate additional findings of fact and conclusions of law. We granted both motions on 15 January 2003. The military judge filed the additional findings and conclusions on 28 January 2003. The Government's Appeal was filed on 24 February 2003. The appellee responded on 10 March 2003. We heard oral arguments on 25 April 2003.

### Standard of Review

In reviewing an interlocutory appeal by the Government of a military judge's ruling dismissing charges, "the Court of Criminal Appeals may act only with respect to matters of law." Art. 62(b), UCMJ; *accord* R.C.M. 908(c)(2). Accordingly, "[we are] bound by the military judge's findings of fact unless they are unsupported by the evidence of record or are clearly erroneous." *United States v. Lincoln*, 40 M.J. 679, 683 (N.M.C.M.R.1994), *aff'd in part and set aside in part*, 42 M.J. 315, 321–22 (1995). "We conduct a *de novo* review of his conclusions of law." *United States v. Stevenson*, 52 M.J. 504, 505 (N.M.Ct.Crim.App.1999), *rev'd on other grounds*, 53 M.J. 257, 261 (2000).

### Background

The CA for this special court-martial is the Commanding Officer, Naval Mobile Construction Battalion ONE THIRTY–THREE (NMCB 133). At the time of referral of charges and litigation of the motion to dismiss, the command was located at Naval Construction Battalion Center (CBC), Gulfport, Mississippi. The present controversy arose when the trial defense counsel (TDC), having already procured a pretrial agreement, went to the NMCB 133 spaces to obtain sentencing witnesses. Chief Equipment Operator (EOC) Metheny, U.S. Navy, a member of NMCB 133, agreed to testify and pass out questionnaires to other senior enlist-

ed personnel in the command he thought could help the appellee. EOC Metheny then went to brief his commanding officer, Commander Douglas G. Morton, Civil Engineer Corps (CEC), U.S. Navy, the CA in this case, about testifying. The CA told EOC Metheny that he, EOC Metheny wasn't going to testify. EOC Metheny reported that to the TDC and also indicated that nobody else at the command could testify. The TDC then filed a motion to dismiss based on unlawful command influence. After hearing testimony from the TDC, EOC Metheny, Lieutenant John Weber III, Judge Advocate General's Corps (JAGC), USNR[1], and the CA, the military judge granted the motion.

### Military Judge's Findings of Fact

With the exceptions and clarifications noted below, we adopt the findings[2] of the military judge as our own:

1. In September 2002, Lieutenant Brian Maye, JAGC, USNR, acting in the proper execution of his duties as detailed defense counsel in connection with the above-captioned matter, visited the spaces occupied by Naval Mobile Construction Battalion 133 located at Gulfport, Mississippi. Record at 22.

2. Lieutenant Maye sought out and spoke with Chief Metheny with the purpose of interviewing the chief as a potential witness on sentencing and so as to facilitate the dispersal of several witness questionnaires in furtherance of the accused's case. Record at 22–23.

3. Chief Metheny was most courteous to detailed defense counsel during this initial meeting and promised to locate the accused's service record and brig report. Record at 23.

4. During this meeting, Lieutenant Maye handed Chief Metheny six character witness questionnaires. At this point, Chief Metheny volunteered to testify on behalf of the accused. Lieutenant Maye advised Chief Metheny of the date and time of the court-martial and promised to attempt to

---

1. LT Weber was the Senior Defense Counsel in Gulfport and a witness to one of the conversations the TDC and EOC Metheny had about testifying at trial.

2. The findings are quoted here verbatim, with minor typographical and punctuation errors in the original text corrected.

have the time moved back if the Chief's schedule could not accommodate his presence. Record at 24.

5. During this interview in which Chief Metheny volunteered to testify, he indicated to Lieutenant Maye that EOCN Gore was a "really nice guy" and that he thought the accused should be retained. He also identified a Chief Smith from the command as another individual who believed the accused was worth retaining. Record at 24.

6. The initial interview between Lieutenant Maye and Chief Metheny lasted approximately 35 minutes. Record at 25.

7. Lieutenant Maye was compelled to discontinue the conference due to other appointments. Chief Metheny ended the meeting with an invitation for Lieutenant Maye to return the following day so as to obtain the completed questionnaires. Record at 25.

8. Chief Metheny had identified some first class petty officers in addition to Chief Smith as prospective recipients of the questionnaires. Record at 26.

9. Lieutenant Maye did not hear from Chief Metheny on Wednesday 18 September 2002, so he determined to visit the Chief at his command. Record at 27.

10. At approximately 1300 on 18 September 2002, Lieutenant Maye had a second conversation with Chief Metheny, during which the Chief advised detailed defense counsel that he could not be of any assistance with regard to the accused. Chief Metheny indicated that this absence of assistance would include his inability to tender testimony and included non-cooperation regarding the questionnaires. Record at 27.

11. Chief Metheny was specific in declining to testify both in person and via telephonic conference. Record at 27.

12. When pressed by Lieutenant Maye for a reason for his change of attitude, Chief Metheny indicated that his Commanding Officer (the convening authority) had told him that he could not help the accused. This conversation took place on the quarterdeck of Naval Mobile Construction Battalion 133 spaces. Record at 28.

13. After departing the command, Lieutenant Maye immediately returned thereto and engaged Chief Metheny in yet another conversation during which he advised the Chief that the commanding officer's direction was improper, to which the Chief responded by indicating that he had to look out for his career, that the accused would be out of the brig in thirty days and that Metheny considered the conversation with detailed defense counsel to be private. This conversation took place in a passageway. Record at 28–29.

14. After consulting with fellow counsel, detailed defense counsel determined to establish a setting wherein Chief Metheny would repeat his comments before a third party. Detailed defense counsel discovered that his Officer–in–Charge, Lieutenant Weber was at Naval Mobile Construction Battalion 133. Accordingly, he proceeded back to the command and extracted Lieutenant Weber from a legal assistance evolution. Record at 30.

15. Subsequently, Lieutenant Weber, Lieutenant Maye and Chief Metheny discussed the chief's altered stance in a conference room at the command. Chief Metheny indicated that he considered the conversation to be "off the record" and again indicated that the commanding officer did not want him to testify. He indicated that per the commanding officer, he was not going to assist the accused nor was any other member of the command. Record at 31.

16. During this meeting, Chief Metheny alluded to negative ramifications that would stem from testifying and terminated the meeting by grasping his collar device and stating that he had attained his present grade in a shorter period than should have been expected. Chief Metheny indicated that one gets ahead by not bucking the system. Record at 31–32.

17. On that same date, Lieutenant Maye contacted the Staff Judge Advocate's Office at CBC Gulfport and reported the matter to the Legalman Chief, Chief Sheffer. Subsequently, Chief Sheffer contacted the executive officer of Naval Mobile Battalion 133 and discussed the matter

with that officer. Chief Sheffer contacted the command with the intention of advising them that any instruction by the commanding officer to a prospective witness similar to that conveyed by Lieutenant Maye would be improper. Chief Sheffer subsequently advised Lieutenant Maye that he had discussed the matter with the executive officer but not the commanding officer, that the allegations were denied as untrue and that a wardroom meeting of some kind was going to be called regarding the situation. Record at 33.

18. Lieutenant Maye had a subsequent conversation with Chief Sheffer who had apparently had a second conversation with the command (either the CO or XO). Chief Sheffer inquired of Lieutenant Maye why he was in the command spaces and advised detailed defense counsel that he should have used Chief Sheffer's office in connection with any sentencing hearing requests. Chief Sheffer also advised that the command had again denied the allegations. Record at 34.

19. Chief Sheffer informed Lieutenant Maye that he should have advised the command as to the purpose of his visit and that Chief Metheny would be at NAS Pensacola for trial the following day, 19 September. Record at 34.

20. Lieutenant Maye discovered that Chief Metheny was present to testify on the date of trial, but indicated to detailed defense counsel that he could not be of any help to him. Chief Metheny also stated that the commanding officer had told him to tow [sic] the line and that is what he was going to do. He further stated that the accused was going to be released within 30 days and was not worth risking a career for. Present at this meeting was another prospective witness, Master Sergeant Tie, to whom Metheny conceded that the commanding officer did exert pressure over his prospective testimony. Record at 38.

21. Chief Metheny indicated to Lieutenant Maye that he had received a phone call from the commanding officer the evening prior to the date of trial. Record at 39.

22. Chief Metheny advised Lieutenant Maye that if he testified favorably to the accused he would not be promoted senior chief. He further informed detailed defense counsel that if he did testify it would be in a manner consistent with the command's wishes. Record at 41.

23. Chief Metheny, in a subsequent conversation with Lieutenant Maye indicated that while detailed defense counsel had a license and client to protect, he had a family to protect. He again advised detailed defense counsel that he would testify in a manner desirable to the command. Record at 42.

24. Detailed defense counsel did not take steps to secure the testimony of Chief Smith or the first class petty officers other than to entrust questionnaires to Chief Metheny for their use. Record at 51.

25. That during one of his conversations with Chief Metheny on the day before trial, Chief Metheny told detailed defense counsel that he had to recognize that the commanding officer authored his fitness report. Record at 54.

26. That in a meeting where trial counsel was present with detailed defense counsel on the date of trial, Chief Metheny indicated that he was not going to testify on behalf of a sailor who left his command in the way the accused was alleged to have departed. Record at 57.

27. That on the date prior to trial, Chief Metheny advised detailed defense counsel that he was not going to "risk his balls" about a guy like Gore or challenge the command for the accused. Record at 58.

28. This Court was most impressed by the demeanor of Lieutenant Maye throughout the tenure of his testimony. While somewhat combative with trial counsel, he was ardent in his convictions and never appeared deceptive. This judge advocate seemed acutely aware of the professional ramifications of deception before the Court. This Court was convinced beyond any doubt that Lieutenant Maye was being truthful.

29. Chief Metheny denied volunteering to testify on behalf of the accused. Record at 71.

30. Chief Metheny testified that he was not sure why he was at NAS Pensacola, and that he thought it might be to serve as a command representative. Record at 77–78.

31. When Chief Metheny testified under oath that he had discussed the accused with the commanding officer and was told he did not have to travel to NAS Pensacola but could if he wished to, and further testified that he was not sure of his capacity and that it might be as an escort or command representative, his face was blushed and he was looking down, head slightly bowed. Record at 77–79.

32. Chief Metheny testified that he could not recall being asked to testify electronically. Again, his face was red and head bowed when answering the question. He appeared to the Court to be acutely uncomfortable. Record at 80.

33. When Chief Metheny testified that during his meeting with Lieutenant Weber and Lieutenant Maye he did not discuss the prospect of appearing as a witness at the trial, his face was red, his eyes were averted from the direction of the Court and he appeared most uncomfortable. Record at 82.

34. Chief Metheny testified that the commanding officer viewed the trial as a "done deal" ... the result already pre-determined. Record at 83.

35. When Chief Metheny testified that he could not recall saying "you don't know what could happen to me if I testified in this case" his head was bowed and his eyes were averted from the Court. Record at 84.

36. Chief Metheny recounted a meeting with the commanding officer the day before trial during which the commanding officer indicated that the command should have notified the NLSO detachment as to the inappropriateness of detailed defense counsel visiting the command and not checking in with the executive officer. He also testified that at this time, the commanding officer instructed him to attend the court-martial. Record at 85.

37. The Court was rather at a loss to connect any logical nexus between Chief Metheny's statement that he was not required to attend the trial and his subsequent statement that he was directed to attend. This is further confused by the chief's inability to articulate what role he was to play at the trial. Record at 86.

38. The continuous displays of discomfort by the chief, inconsistencies in his testimony and repeated failure to recall events no more than 36 hours old left the Court with the clear belief that the witness was being deceptive and was terrified to testify as he might have previously wished. This conclusion was buttressed by the subsequent testimony of Lieutenant Weber.

39. The Court was amazed when Chief Metheny finally settled on a position that he had been sent to the trial as an escort after having previously articulated that he did not know why he was sent to NAS Pensacola. His demeanor continued to betray dishonesty, both in the ashen tone of his skin, which varied as his testimony continued, and his constant movement in the witness box. Record at 86.

40. The Court became so skeptical as to the obvious deception of the witness expressed via his demeanor and the content of his testimony that it felt compelled to warn him as to the general nature of evidence already received by the Court and to remind him that he was under oath and subject to perjury. Record at 88.

41. The Court continued to believe that the chief was being dishonest and was in fear of reprisal when he testified that he had engaged in conversations with Lieutenant Maye in confidence whilst at the same time tendering sworn testimony that on its face could not reasonably be the source of a confidential conversation. Record at 90.

42. The Court could not comprehend why Chief Metheny would have discussed his accelerated pace of promotion with detailed defense counsel if his substantive testimony vis a vis the accused were not somewhat controversial (i.e. an opinion that the accused had future rehabilitative potential). If Metheny's conversations with Lieutenant Maye were as peremptory as he articulated during his testimony, it

would defy logic that Lieutenant Maye would pursue him for follow-up interviews. Likewise, the Court cannot understand why the chief would parley with detailed defense counsel about protecting family or a loved one if there was not more substance to their conversations than the chief would concede. This complete disconnect in the witnesses testimony played a key role in the Courts evaluation of his credibility, or more properly put, lack thereof. Record at 96–97.

43. When Chief Metheny stated that he believed Lieutenant Maye had "twisted" what Metheny had said, his eyes were averted from the Court and he was grasping his hands and generally illustrated an uncomfortable deportment. Record at 98.

44. As the chief continued to testify, his testimony became more and more disjointed. He would concede that his personal opinion as to the accused's unauthorized absence made him feel as though he was undermining his command. However, he also testified that he agreed with the command's view of the accused and did not understand his role at the court-martial. The chief then testified that he did know what his role was, that being a command escort. This illogical dribble betrayed to the court the fact that the chief was under considerable duress. He was a man desperate to please his commanding officer. He impressed the Court as a witness who did not feel free to express his true opinions or accurately recount what he knew to be true. The chief, under rather intense questioning from the Court finally conceded that he had been told by the commanding officer that he was not going to testify in the case. Record at 99.

45. The court would note that this concession runs afoul of the chief's testimony that he did not know that he was desired as a witness. Record at 87, 99.

46. Chief Metheny, under further examination from the Court conceded that he did in fact tell detailed defense counsel that it was unwise to buck the system. The Court was left to wonder why he would make such a statement if he did not believe he was going to even be a witness at the trial. How would he potentially buck the system as a command escort? Record at 99.

47. Chief Metheny was unable to explain a comment he attributed to the commanding officer made while directing the chief to attend the trial to the effect of "your opinions are your opinions" as contrasted with the chief's testimony that he was not to attend as a witness and had not been asked to be a witness. He could not address the question of why his opinions would be relevant or why the commanding officer would even refer to them if he was to appear as a command representative or escort vice as a witness. Moreover, the chief waffled back and forth on whether or not he had discussed his personal opinions regarding the accused with his commanding officer. Record at 100–03.

48. In sharp contrast to Chief Metheny's riddled testimony, Lieutenant Weber, the Officer–in–Charge of the Detachment in Gulfport presented as a most credible fact witness.

49. Lieutenant Weber was at the NMCB–133 spaces on 18 September 2002 when he was approached by detailed defense counsel. Lieutenant Weber confirmed that Chief Metheny had initially volunteered to testify on behalf of the accused. Record at 111–12.

50. Lieutenant Weber confirmed that Chief Metheny had a clear understanding that the defense desired to call him as a witness during the sentencing phase of the trial. In addition, he confirmed that Chief Metheny was most uncomfortable about the prospect of testifying on behalf of the accused based on a directive from his commanding officer that he was not going to testify. Lieutenant Weber also corroborated Lieutenant Maye's testimony concerning Chief Metheny's comment on the commanding officers role in authoring his fitness report. Record at 113.

51. Significantly, Lieutenant Weber confirmed that Chief Metheny had indicated that subsequent to the intervention of the commanding officer, no member of the command was going to testify for the accused and the witness questionnaires sub-

mitted by detailed defense counsel would not be completed. Record at 114.

52. Chief Metheny advised his commanding officer that he was going to be in Pensacola to testify at trial and asked him if he needed anything from Pensacola. It was only at this point that Chief Metheny was informed by this commanding officer that he was not going to Pensacola. Record at 115.

53. Chief Metheny expressed concern that if he testified his promotion opportunity would be damaged. Record at 115.

54. The convening authority expressly instructed Chief Metheny not to testify on behalf of the accused two days prior to trial. The convening authority noted that a witness was already set to testify on behalf of the accused. The convening authority appeared exceedingly irritated that a detailed defense counsel had conversed with a member of his command minus his permission to do so. Record at 124.

55. The convening authority was confused as to why a live witness would be required by the defense when he had entered into a pre-trial agreement with the accused. The convening authority's physical deportment exuded dismay and impatience at having to testify and in any way justify his actions. Record at 125.

56. The convening authority viewed Lieutenant Maye's interview of Chief Metheny and his plans to call him as a witness for the defense as a personal affront. This was confirmed not only through the verbiage deployed by the convening authority but also by his tone and physical deportment which exhibited contempt and anger. Record at 125.

57. The commanding officer/convening authority made his own determination that Chief Metheny would not have sufficient basis to testify on behalf of the accused. Record at 125–26.

58. The convening authority confirmed that Chief Metheny knew that after Chief Sheffer had conversed with the commanding officer on issues related to allegations of unlawful command influence, that he would be going to NAS Pensacola to testi-fy, not as a command representative or for any other purpose. Record at 127.

59. The convening authority discussed the details of his sentence limitation agreement in the case at bar with Chief Metheny. Record at 127.

60. That this testimony is in sharp contrast to the testimony offered by Chief Metheny that he had no specific recollection of a conversation less than 48 hours old and a conversation of which the convening authority had copious recall. Record at 127; see also Record at 100.

61. The convening authority comported himself in a most arrogant manner, even interrupting the Court. Record at 126.

62. The commanding officer was indignant towards having to attend the proceedings and stressed that he was missing an operational meeting so as to testify. Record at 131.

63. The convening authority expressly admitted that he did not believe that Chief Metheny had knowledge that was germane to the court-martial. Record at 132, 140.

64. The convening authority conceded that he questioned Chief Metheny as to why he would want to testify in this case. Record at 132.

65. The convening authority conceded that he viewed the trial as a "done deal" due to the pre-trial agreement and told Chief Metheny so. Record at 133.

66. When the commanding officer, after receiving legal advice and cognizant of an allegation of unlawful command influence finally determined to send Chief Metheny to Pensacola for trial, he took the opportunity to advise the Chief that he (the commanding officer) disapproved of detailed defense counsel's methods. Record at 136.

67. The convening authority had never been in a position to "see what a special court does." Record at 137.

68. The convening authority was most animated in describing his disdain for detailed defense counsel and for what he believed were "backdoor" like practices. Record at 138.

69. When discussing his prospective testimony, the convening authority cautioned

Chief Metheny to stick to the facts. Record at 139–40.

70. In response to the Court's questions, the commanding officer's deportment was generally disdainful of the proceedings.

Findings of Fact and Conclusions of Law in Support of Order of Dismissal with Prejudice of 28 January 2003.

In our review of these findings of fact, we note that a few of the findings are merely summaries of testimony.[3] Where the testimony is not impeached or rebutted and is apparently credible on its face, we accept the testimony as fact. Other findings are best understood when all relevant testimony is considered. Our scrutiny of these few findings follows.

Finding of fact # 8 refers to a Chief Smith and some first class petty officers that EOC Metheny identified as possible witnesses for the appellee. We note that the record does not identify these possible witnesses nor does it describe any relationship that the witnesses might have with the appellee. Most importantly, there is nothing in the record to indicate that any prospective witness other than EOC Metheny was affected in any way by the CA's statements or actions.

Finding of fact # 17 addresses testimony by LT Maye regarding a telephone conversation with Chief Sheffer at the staff judge advocate's office. Part of the finding states that Chief Sheffer advised that a wardroom meeting would be held to discuss the general issue. As implied in this and subsequent findings, the record does not show whether such a meeting was ever held, and if held, who was present or what was said. In the absence of any evidence of record, we will not presume that a wardroom meeting was held.

Finding of fact # 20 addresses testimony by LT Maye regarding a conversation with

EOC Metheny. In pertinent part, the finding states, "Chief Metheny also stated that the commanding officer had told him to tow [sic] the line and that is what he was going to do." When the commanding officer testified, he was asked if he told EOC Metheny to toe the line, or words to that effect. The commanding officer responded:

No. Chief Metheny is one to really talk on. He is a Seabee's Seabee. He will do anything for any troop, anytime. I know he can talk and talk. I said, "Stick to the facts, the facts that you know." That's all I told him.

Record at 139. Given the weakness of EOC Metheny's general credibility[4], we find that the chief's testimony regarding the "toe the line" comment was inaccurate.

Finding of fact # 54 states that the CA was "exceedingly irritated that a detailed defense counsel had conversed with a member of his command minus his permission to do so." As indicated by findings of fact # 36, # 66, and # 68, the CA was more upset about LT Maye coming into his spaces without notice to the command and ordering one of the CA's subordinates to travel to Pensacola[5] to testify at trial. The CA testified that he was taken aback when EOC Metheny first approached him about testifying in Pensacola. He explained that he understood that Senior Chief Caldwell was already set to come and testify in the sentencing phase of the court-martial, so he did not understand why:

[S]omebody [would come] in my spaces, approach[ ] one of my Chiefs without my knowledge, and ask[ ] or order[ ] them to come to Pensacola. So, I told the Chief I didn't want him to go to Pensacola, and— and that was all there was to it.

Id. at 124. The CA went on to testify that he didn't understand that the Chief would be a witness for the appellee because he barely

---

3. We urge military judges to make specific findings of fact rather than merely summarizing testimony. Thus, in making such findings, a military judge should answer the question, "What happened?" rather than the question, "What did the witness say?"

4. In findings 37–47, the military judge discussed EOC Metheny's inconsistent testimony at length. As best we can determine after careful consideration of all findings and conclusions of the military judge, he decided that EOC Metheny told the truth some of the time and lied some of the time during his testimony on the motion.

5. We take judicial notice that the approximate driving time between Gulfport and Pensacola is 2–3 hours.

knew the appellee. But the CA emphasized that was not in his thoughts at the time of the conversation with the Chief. Rather, his thought was that "somebody came in and asked for one of my people without my permission. And if that's a standard, it's a standard I wasn't familiar with." *Id.* at 126.

Finding of fact #61 states that the CA "comported himself in a most arrogant manner, even interrupting the Court." Our review of the record indicates that the military judge interrupted the CA, perhaps for a good reason, during the CA's testimony. We cannot find a single instance where the CA interrupted the military judge. As to any arrogant demeanor, we do not discern any arrogance in the record. However, we were not in the courtroom and could not observe the CA. Thus, we defer to the military judge on that point. Regardless, we conclude that this finding of fact has little to do with the CA's earlier conversations with EOC Metheny.

We note that the CA also testified that his unit was preparing for a possible deployment, possibly to Southwest Asia, and that that was a factor in his reaction to EOC Metheny's notification that he was going to Pensacola to testify. During oral argument, we were advised that Commander Morton, his unit, and the appellee are, in fact, currently deployed to that area.

### Discussion

■ Unlawful "[c]ommand influence is the mortal enemy of military justice." *United States v. Thomas,* 22 M.J. 388, 393 (C.M.A. 1986). Unlawful command influence includes statements or actions by the CA or higher authority in the chain of command that tends to intimidate potential witnesses from testifying for the defense at trial, whether on the merits or for sentencing. *United States v. Gleason,* 43 M.J. 69, 73–75 (1995); *Thomas,* 22 M.J. at 393, 396–97.

■ The defense bears the burden of raising the issue of unlawful command influence. *United States v. Stombaugh,* 40 M.J. 208, 213 (C.M.A.1994). "To raise the issue, the defense must (1) show facts which, if true, constitute unlawful command influence; (2) show that the proceedings were unfair;

and (3) show that unlawful command influence was the cause of the unfairness." *United States v. Biagase,* 50 M.J. 143, 150 (1999), (citing *Stombaugh,* 40 M.J. at 213).

■ Once the issue of unlawful command influence is raised, "the Government must prove beyond a reasonable doubt: (1) that the predicate facts do not exist; or (2) that the facts do not constitute unlawful command influence; or (3) that the unlawful command influence will not prejudice the proceedings or did not affect the findings and sentence." *Biagase,* 50 M.J. at 151.

As indicated previously, in reviewing a Government appeal, the standard of review for issues of law, including unlawful command influence, is *de novo. Stevenson,* 52 M.J. at 505. With that in mind, we now examine the military judge's conclusions of law.

In referencing the "erratic, nervous and deceptive deportment" of EOC Metheny, the military judge concluded that EOC Metheny had been "chilled" and that his "voluntary commitment to testify in a positive nature as to the accused [sic] rehabilitative potential" had been seriously compromised by the "interloping behavior" of the CA. Findings of Fact and Conclusions of Law in Support of Order of Dismissal with Prejudice of 28 January 2003. The military judge then considered an appropriate remedy for this unlawful command influence, including "remedies short of dismissal with prejudice." *Id.* Having considered such remedies, the military judge concluded that:

[T]he only remedy that addressed the rabid form of unlawful command influence placed before the Court [referring to himself as the military judge] was dismissal with prejudice. Here we had a commanding officer who by his own admission determined that a witness who had volunteered to testify for the defense was not germane to the proceedings. Moreover, we had a commanding officer who briefed the prospective defense witnesses on the *minutiae* of the pre-trial agreement and ordered him to "stick to the facts". Here we had a chief petty officer whose deportment and inconsistent testimony betrayed the chilled nature of his presentation. Fi-

nally, there was no way for the Court to be sure that the taint of the commanding officers [sic] wrongful intervention had not spread beyond its obvious impact on Chief Metheny who had been driven to the point where he was, in this Courts [sic] view, willing to commit perjury rather than defy his commanding officer.

*Id.* Having drawn these conclusions, the military judge determined that "dismissal with prejudice was the only logical remedy available." *Id.*

■ We conclude that the defense presented sufficient evidence to raise the issue of unlawful command influence by showing that EOC Metheny, and possibly other witnesses, were deterred from expressing a candid opinion favorable to the appellee because of the convening authority's words and actions. The burden then shifted to the Government to prove beyond a reasonable doubt that: (1) the facts do not support findings of interference by the CA in the TDC's efforts to obtain defense witnesses for sentencing, or even if such facts exist, that (2) those facts did not constitute unlawful command influence, or even if such unlawful command influence existed, that (3) it would not prejudice the proceedings. As we read the case law, the standard of proof beyond a reasonable doubt applies to each of those three steps individually. Based on our review of the record and the findings of fact, we conclude that the military judge was correct in concluding that the Government did not bear its burden beyond a reasonable doubt. However, we also conclude that the military judge abused his discretion in selecting an appropriate remedy.

■ We are not aware of, and counsel have not cited to us, pertinent military authority that would apply an "abuse of discretion" standard to the choice of remedy for unlawful command influence. Apparently, this is an issue of first impression. We believe that an analogy to the law of mistrial provides support for our use of the "abuse of discretion" standard.

When a military judge declares a mistrial, he essentially orders the withdrawal of the affected charges and specifications from the court-martial. R.C.M. 915(c)(1). "The mili-tary judge may, as a matter of discretion, declare a mistrial when such action is manifestly necessary in the interest of justice because of circumstances arising during the proceedings which cast a substantial doubt upon the fairness of the proceedings." R.C.M. 915(a). Of note, a mistrial may apply to some or all charges, and may apply only to sentencing proceedings. R.C.M. 915(a). The standard of appellate review of a decision to grant or not grant a mistrial is abuse of discretion. *United States v. Rushatz*, 31 M.J. 450, 456 (C.M.A.1990); *see* R.C.M. 915(c)(2). When circumstances arise that cast a substantial doubt upon the fairness of the proceedings, the military judge may select a remedy short of the drastic declaration of mistrial, such as a curative instruction. *Rushatz*, 31 M.J. at 456–57.

Like the typical mistrial scenario, an allegation of unlawful command influence often strikes at the heart of the integrity of the adversarial process. Actions prompting a mistrial may affect the fairness of the trial on the merits alone, or may affect the sentencing hearing alone, or both. The same is true for statements and actions comprising unlawful command influence. While prompt and emphatic judicial relief is necessary to salvage a fair trial, whether the issue be mistrial or unlawful command influence, no single remedy is legally mandated or appropriate. Rather, the remedy must be carefully contemplated and tailored to the facts and circumstances at hand. In doing so, the military judge exercises discretion in choosing a suitable remedy. Thus, we hold that the correct appellate standard for reviewing a military judge's choice of remedy for unlawful command influence is abuse of discretion. In so holding, we are mindful that our superior Court has long held that the appellate standard of review for unlawful command influence issues is, generally speaking, *de novo*. *United States v. Rivers*, 49 M.J. 434, 443 (1998). However, we read the above-cited and other cases to apply that standard only to conclusions of law as to the existence of unlawful command influence and its effect upon the findings and sentence, if any, not to the appropriate remedy.

We are not persuaded that the ultimate sanction of dismissal of all charges with prejudice was necessary and appropriate for the CA's improper influence in this case, primarily because the influence extended only to prospective evidence in sentencing. So far as we can tell, the CA's statements and actions would have no prejudicial effect of any kind upon the findings. We acknowledge that when the motion to dismiss was litigated, the appellee had not yet entered his pleas. Nevertheless, there was a pretrial agreement, and it evidently contemplated guilty pleas since the CA considered the case a "done deal." Record at 133. We also understood the oral arguments to focus exclusively on the sentencing hearing. Thus, we conclude that the only prejudice the appellee stood to suffer at trial was in the sentencing hearing, and that was limited to the testimony of EOC Metheny. Any extension of the CA's influence to other prospective command witnesses is purely speculative, especially since there is nothing in the record to show that anyone in the command other than the CA, XO, and EOC Metheny even knew what had happened.

█ In our consideration of the military judge's exercise of his discretion, we cite with favor the reasoning of our Army colleagues in a landmark case involving unlawful command influence: "We believe that reversal is clearly not required in all cases where the appearance of unlawful command influence exists, but should be invoked only when other measures have been tried and found wanting or are obviously inadequate." *United States v. Cruz*, 20 M.J. 873, 890 (A.C.M.R.1985), *rev'd in part*, 25 M.J. 326 (C.M.A.1987). We think the same reasoning applies to the remedy of dismissal of charges, particularly when the military judge chooses to add the words, "with prejudice." Among other possible remedies for the unlawful command influence in this case were:

1. Precluding the Government from calling any witnesses in aggravation;

2. If aggravation witnesses were permitted, prohibit them from offering any

opinion as to the appellee's rehabilitative potential;

3. Direct the Government to stipulate to the expected testimony of EOC Metheny, i.e., the testimony he anticipated giving before the CA intervened, and instruct the CA that he may not consider EOC Metheny's participation in this case in writing his performance evaluation, or in the alternative, order that the CA's superior in the chain of command write and sign the evaluation, based on input from EOC Metheny's immediate supervisor; [6]

4. Direct the Government to stipulate, as fact, to the appellee's good military character;

5. Direct the Government to produce any witness requested by the defense and assure each witness that any complaint about subsequent adverse performance evaluations by the CA or subordinates in the rating chain may be submitted to the CA's superior in the chain of command or the Inspector General;

6. Preclude the Government from cross-examining any defense witnesses.

█ In considering whether the military judge abused his discretion in choosing to dismiss all charges with prejudice, we applied the following factors: (1) the nature and relative egregiousness of the CA's unlawful influence; (2) the extent of the impact of the CA's unlawful influence on the integrity of the court-martial process; and (3) the availability of alternative, less drastic, remedies. *See United States v. McClintock*, 748 F.2d 1278, 1284 (9th Cir.1984)(addressing the availability of less drastic sanctions than dismissal of indictment); *see also United States v. Sears, Roebuck, and Co.*, 719 F.2d 1386, 1392 (9th Cir.1983)(holding prosecutorial misconduct during grand jury proceedings did not warrant district court's dismissal of indictment where the "relevant inquiry ... focuses not on the degree of culpability of the prosecutor but on the impact of his misconduct on the grand jury's impartiality."). Dismissal of all charges with prejudice would be appropriate only when the unlawful command influence rendered the entire trial pro-

---

6. We note that since the CA testified regarding his unlawful command influence, he would not take post-trial action on the sentence. R.C.M. 1107(a).

cess fundamentally unfair. For the reasons stated, we conclude that the CA's unlawful command influence affected the sentencing hearing only. Thus, in dismissing the charges with prejudice, the military judge abused his discretion. Of course, even if we apply a pure *de novo* standard, vice abuse of discretion, to the military judge's choice of remedy, for the reasons stated above, we still hold that he erred.

### Conclusion

The Government's appeal is denied as to the conclusions of the military judge that unlawful command influence existed and that it tainted the proceedings. The Government's appeal is granted as to the remedy of dismissal of all charges with prejudice. The record is returned to the Judge Advocate General for remand to the military judge, who will select an appropriate remedy, short of dismissal of charges, commensurate with the degree and extent of the unlawful command influence.

Judge CARVER and Judge RITTER concur.